

# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CF 135 Flat LLC *et al.*,

> Plaintiffs,

—v—

Triadou SPV N.A. *et al.*,

> Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JUN 2 4 2016

15-CV-5345 (AJN)

MEMORANDUM AND
ORDER

ALISON J. NATHAN, District Judge:

On April 1, 2016, Almaty and BTA Bank ("Movants") requested a preliminary injunction

pursuant to Federal Rule of Civil Procedure 65 to prevent Triadou from enforcing its $10.5

million state court judgment against CF 135 Flat LLC, CF 135 West Member LLC, and the

Chetrit Group LLC ("the Chetrit Entities"). Dkt. No. 106. On May 11, 2016, Movants filed an

additional motion for attachment of Triadou's assets under Federal Rule of Civil Procedure 64

and New York Civil Procedure Law and Rules ("CPLR") § 6212(a). Dkt. No. 140. The Court

construed Movants' papers as requesting a temporary restraining order while the preliminary

injunction motion was pending, but the Court denied that request on May 3, 2016. Dkt. No. 131.

For the reasons articulated below, Movants' motion for a preliminary injunction is denied, but

their motion for attachment is granted.

## I.   BACKGROUND AND PROCEDURAL HISTORY

In 2014, Triadou assigned its interest in the New York-based Flatotel condominium

project to the Chetrit Entities. Dkt. No. 103 at 1. Under the contract, the Chetrit Entities were to

pay Triadou $21 million in four installment payments. *Id.* The Chetrit Entities did not make the

EXHIBIT 1

7

required payments and Triadou has, to date, been awarded judgments totaling $10.5 million in the course of ongoing state court litigation on the issue. *Id.*

In July 2015, the Chetrit Entities initiated an interpleader complaint based on the 2014 assignment agreement. Dkt. No. 1. In their Answer, Movants filed a number of crossclaims, counterclaims, and claims against third parties. Dkt. No. 49. Although the interpleader complaint has been dismissed, Dkt. No. 103, and Movants have settled their claims against the Chetrit Entities, Dkt. Nos. 69, 71, the Movants' claims against Triadou, Ilyas Khrapunov, Viktor Khrapunov, and Mukhtar Ablyazov are still pending. The substance of those claims is discussed at length in the Court's June 21, 2016 Memorandum and Order, Dkt. No. 174, and the Court assumes familiarity with that material. In brief, Almaty and BTA Bank allege that the Khrapunovs and Ablyazov stole substantial amounts of money from them and then laundered those funds throughout the world. Dkt. No. 49 ¶¶ 20-23. Particularly relevant here, Movants allege that Triadou worked with the Chetrit Entities to launder these stolen funds into real estate projects, including the Flatotel and Cabrini Medical Center projects in New York. *Id.* ¶¶ 24-25.

Based on their allegations that Triadou is a vehicle for money laundering, Movants now seek to enjoin Triadou from enforcing its $10.5 million state court judgment against the Chetrit Entities. Dkt. No. 106. Shortly after that motion was filed, Movants informed the Court that Triadou had filed an application in state court to enforce its judgment against the Chetrit Entities through the appointment of a receiver. Dkt. No. 113 at 1. Because the state court set a May 4, 2016 hearing date on Triadou's receiver request, Movants requested an expedited schedule to resolve the preliminary injunction hearing. *Id.* at 2. The Court construed this as a request for a temporary restraining order. Dkt. No. 131 at 1. On April 28, 2016, Triadou and the Chetrit Entities entered into a stipulation narrowing the scope of the requested receivership. Dkt. No.

2

EXHIBIT 1

8

127 Ex. 1. Based in large part on this stipulation, the Court denied Movants' request for a temporary restraining order. Dkt. No. 131.

On May 11, 2016, Movants supplemented their motion for a preliminary injunction by adding an alternate request that the Court authorize attachment of Triadou's assets under Federal Rule of Civil Procedure 64 and CPLR § 6212(a). Dkt. No. 140. The Court held an evidentiary hearing on the preliminary injunction motion and motion for attachment on May 19, 2016. In connection with that hearing, Movants elicited testimony from Abigail Tudor (a paralegal), Jehoshua Graff (lawyer for the Chetrit Entities), Nicolas Bourg (former director of Triadou), Lee Eichen (a partner at a real estate financial advisory firm), and Matthew Meltsner (the project manager of the Flatotel project). Triadou elicited testimony from Cesare Cerrito, the current director of Triadou. Following trial, the parties filed post-hearing briefing and updated proposed findings of fact[1] that were fully submitted on June 20, 2016.

## II.    FINDINGS OF FACT[2]

When "essential facts are in dispute" in connection with a motion for a preliminary injunction, "there must be a hearing and appropriate findings of fact must be made." *Visual Scis., Inc. v. Integrated Commc'ns Inc.*, 660 F.2d 56, 58 (2d Cir. 1981) (first citing *Forts v. Ward*, 566 F.2d 849 (2d Cir. 1977); then citing Fed. R. Civ. P. 52(a)). "These findings are not conclusive, and may be altered after a trial on the merits" but nevertheless "must be made." *Id.* Based on the information presented in connection with the preliminary injunction proceedings, the Court makes the following findings of fact.

---

[1] Both parties submitted post-hearing findings of fact and were provided an opportunity to respond to each other's proposed findings of fact with opposing record citations. *See* Dkt. Nos. 165, 169, 171. If a party did not oppose a proposed finding of fact with an appropriate record citation, and if that unopposed proposed finding of fact was supported by an appropriate record citation, the Court deemed that fact admitted and incorporates unopposed facts as factual findings of the Court.

[2] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

EXHIBIT 1

9

### A.   Ablyazov Embezzles From BTA Bank and Becomes the Target of an Asset-Freezing Order[3]

Ablyazov was the Chairman and controlling shareholder of BTA Bank from 2005 until February 2009. Almaty Ex. 33 ¶¶ 15, 42.  In this role, Ablyazov embezzled between $3 and $4 billion from BTA Bank by causing the bank to issue loans to or purchase at inflated prices companies in which Ablyazov had an undisclosed interest.  *Id.* ¶¶ 19, 77, 83, 87-89, 93, 96-110; Almaty Ex. 22 ¶ 3; Almaty Ex. 34 ¶ 11.  Based on Ablyazov's embezzlement, Justice Teare of the Commercial Division of the Queen's Bench entered a freezing order against Ablyazov's assets. Almaty Ex. 23 ¶¶ 3-5.  An entity called Telford Financiers Corp. was named as an "Undisclosed Asset" in that order. Almaty Ex. 23 at 15; Almaty Ex. 24 at 3-4, 36.  Although Ablyazov did not admit his ownership in Telford Financiers Corp., Almaty Ex. 24 at 3-4, other evidence in the record before Justice Teare, *id.* at 18-21 (listing each of the items in the evidentiary record), justified its inclusion in the order freezing Ablyazov's assets.  The freezing order also listed a number of "Disclosed Assets" with ties to the Seychelles and Cyprus.  *Id.* at 22-28.

### B.   Ilyas Khrapunov Founds SDG and Triadou

The Swiss Development Group ("SDG") was incorporated in July 2008.  Dkt. No. 169 ¶ 42.  SDG only has bank accounts in Switzerland and Luxembourg and has never generated any profits.  *Id.* ¶¶ 54, 57.  Ilyas Khrapunov, son-in-law to Ablyazov, and his sister Elvira provided

---

[3] The factual findings in section II.A are based on the findings of UK courts in a series of proceedings against Ablyzov (the "UK Judgments").  Although this evidence is hearsay, such evidence "may be considered by a district court in determining whether to grant a preliminary injunction." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010).  While the fact that certain evidence is hearsay "goes to [the] weight" that the Court may afford certain evidence, it is not a basis for "preclusion" at this stage. *Id.*  The Court rejects Triadou's argument that the UK Judgments "are entitled to no evidentiary weight" solely because they are hearsay, Dkt. No. 170 at 12, as inconsistent with *Mullins*.  The Court is persuaded that the UK Judgments are entitled to substantial weight because they constitute "uncontroverted findings of a respected foreign court based on an appropriate evidentiary record." Dkt. No. 172 at 12.  In fact, Ablyazov appeared before the UK courts and contested the claims against him until he fled the jurisdiction.  Almaty Ex. 33 ¶ 3; Almaty Ex. 34 ¶¶ 4-7.  Notably, Triadou does not argue that some flaw in the UK proceedings renders these factual findings unreliable, nor does it present any contrary version of these facts.

EXHIBIT 1

10

initial funding of between 35 and 40 million Swiss Francs (CHF) to SDG. *Id.* ¶¶ 44, 48, 51.

Ilyas Khrapunov and his sister were the only private individual investors in SDG. *Id.* ¶ 52.

Ilyas Khrapunov was the Chairman of SDG from July 2008 to June 2012. *Id.* ¶¶ 42-43.

In or around 2011, SDG's Board, headed by Khrapunov, decided to create a real estate

investment fund and retained Nicolas Bourg as an outside consultant to head that project. *Id.*

¶¶ 60-61. In 2012, Triadou was incorporated under the laws of Luxembourg as a wholly-owned

investment vehicle for SDG, *id.* ¶¶ 61-62, in order "to conceal the movement and investment" of

Khrapunov and Ablyzov funds. Bourg Decl. ¶ 6.[4] Bourg was the sole director of Triadou from

2011 until November 2014, when he was fired and replaced by Cesare Cerrito. *Id.* ¶¶ 63, 117.

### C.    Triadou Invests in the Flatotel Project

In 2012, SDG's Board decided to invest in the Flatotel and Cabrini projects through

Triadou. *Id.* ¶¶ 79, 83. In October of that year, Triadou acquired a 37.5% interest in the Flatotel

project from the Chetrit Entities. *Id.* ¶ 83. Triadou was a passive capital investor and was

entitled to half the profits of the Flatotel project. *Id.* ¶ 87.

Funds to meet Triadou's capital obligations to the Flatotel project were wired from

Telford International Ltd ("Telford") to an escrow account held by the Chetrit Entities' outside

counsel. *Id.* ¶ 92. Telford is 100% owned by Telford Trust, which belongs to Elena Petelina.

*Id.* ¶ 73. Petelina is married to Gennady Petelin, *id.*, who is Ilyas Khrapunov's sister's father-in-

law. Cerrito Decl. ¶ 9. Telford Trust was registered in Belize with an administrator and nominee

located in Madagascar. Cerrito Decl. Ex. 2 at 2; Dkt. No. 169 ¶ 77. The Deed of Trust was

---

[4] Contrary to Triadou's arguments, Dkt. No. 170 at 3-8, the Court finds Bourg's testimony credible. Any
bias he may hold against Triadou due to his termination does not give him a motive to implicate himself in a far-
reaching money laundering conspiracy that could open him up to civil and possibly criminal liability. The release
from liability he obtained from Movants is logically only valuable to the extent that Bourg *has* any liability to them
based on the alleged misconduct, and thus does not cause the Court to question his credibility. Although there are
several minor inconsistencies in his testimony they are not as significant as Triadou claims. Most importantly,
however, the Court finds Bourg credible because his testimony, unlike that of Cerrito, is consistent with the weight
of the other evidence on key issues.

EXHIBIT 1
11

prepared by a Seychellois corporation and the Trust had bank accounts at FBME Bank Ltd in Cyprus.  Cerrito Decl. Ex. 2 at 7; Dkt. No. 169 ¶ 77; Bourg Decl. ¶ 20.  Telford is an Ablyazov investment entity used to move Ablyazov's funds.[5]  Bourg Decl. ¶ 10.  Between November 2012 and May 2013, the Chetrit Entities received approximately $34 million from Telford's accounts at FBME Bank Ltd. on Triadou's behalf.  *Id.* ¶¶ 99, 102-108.  In July 2015, a component of the U.S. Treasury Department designated FBME Bank Ltd. as a "foreign financial institution of primary money laundering concern" due to its prominent and permissive use by money launderers.  *Id.* ¶ 109.

### D.   Ilyas Khrapunov Steps Down As Chairman

Ilyas Khrapunov stepped down from his position as Chairman in 2012 and became an adviser to the SDG Board due to "negative press" surrounding his family.  *Id.* ¶ 45.  At this time, members of the Khrapunov family, including Ilyas and his father Viktor Khrapunov, were under criminal investigation in Kazakhstan and Switzerland for money laundering.  *Id.* ¶ 46; *see also* Almaty Ex. 26 ¶ 11.  Also around this time, Ilyas and Viktor Khrapunov were added to the Interpol list of wanted persons at the request of the Government of Kazakhstan.  *Id.* ¶ 47.  The negative press surrounding Khrapunov's family hindered SDG's ability to do business, particularly while Khrapunov was Chairman.  *Id.* ¶ 125.  For example, SDG was refused loans "a few times" due to "the presence of Mr. Khrapunov."  *Id.* ¶ 91.  Due, in part, to this negative press, SDG's Board decided to sell SDG.  *Id.* ¶ 130.

---

[5] Triadou argues that "Almaty/BTA have not adduced sufficient evidence linking Telford, the source of Triadou's investment funds [in the Chetrit investments], to Ablyazov." Dkt. No. 170 at 21. Bourg testified about the connection between Telford and Athat Telford was an "Ablyazov investment entity used to conceal and move his funds." Bourg Decl. ¶ 10. This testimony is corroborated by the UK asset freezing order naming another Telford entity, Telford Financiers Corp, as an "Undisclosed Asset" of Ablyazov's, Almaty Ex. 24 at 36; the connections Telford Trust has to the Seychelles and Cyprus that mirror other Ablyazov entities, *id.* at 22-28; and Telford's connection to FBME Bank. Dkt. No. 169 ¶¶ 108-109.

EXHIBIT 1
12

###### E.    SDG Is Sold to Glatz in a Sham Sale

The "sale" of SDG to Philippe Glatz closed on March 25, 2013. *Id.* ¶ 128; Cerrito Decl. ¶ 15. Although Khrapunov was no longer Chairman, he remained an advisor to SDG's Board of Directors for two years after the sale for an annual salary of CHF 250,000. Dkt. No. 169 ¶ 149. During this period of transition, SDG sought financing from Black Sea Trade & Development Bank. *Id.* ¶ 145. Black Sea declined to provide such financing and, in doing so, indicated that it had doubts as to Glatz's ability to finance the purchase of SDG. Almaty Ex. 7 at 4. Based on this information, a representative of Black Sea stated: "I am not persuaded that there's been any real change in the ownership of SDG." *Id.*; Dkt. No. 169 ¶ 146.

In light of this opinion from Black Sea, Triadou's argument that the sale of SDG to Glatz was legitimate is not credible. Triadou attempted to rebut Black Sea's conclusion through Cerrito,[6] who testified: "Although I am not privy to all of Mr. Glatz's finances, I understand, based on working with him for the past three years and on publically available information, that Mr. Glatz's finances were and are sufficient to have purchased SDG . . . ." Cerrito Decl. ¶ 14. As Cerrito admitted on cross-examination, however, he did not have any personal insight into Glatz's finances, May 19, 2016 Tr. ("Tr.") 120:11-13, "ha[d] no idea honestly" about "how much money . . . Glatz [wa]s worth," Tr. 120:22-23, and refused to even provide a rough estimate of Glatz's net worth. Tr. 121:1-4.

Because Triadou introduced evidence about Glatz's finances through Cerrito and not Glatz himself, Movants urge the court to draw a negative inference against Triadou based on the

---

[6] The Court did not find the testimony of Cerrito credible. Due to his current positions as Director of Triadou and CFO of SDG, Cerrito Decl. ¶ 2, he has a significant interest in denying that SDG and Triadou engaged in any misconduct. Second, his description of his "due diligence" of Telford, *id.* ¶ 10, is not credible in light of his knowledge of the money laundering allegations against the Khrapunovs, Tr. 109:3-4, 130:11-24, 133:6-25, 134:1, and Telford's suspicious ties to Belize, Madagascar, the Seychelles, and FBME Bank. Cerrito Decl. Ex. 2, 7. Finally, his description of the sale of SDG and the 2014 assignment are contrary to the weight of the evidence.

7

EXHIBIT 1
13

absence of Glatz's testimony.  Courts may "draw an adverse inference" when "a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction yet . . . fails to call those witnesses." *Sagendorf-Teal v. Cty. of Rensselaer*, 100 F.3d 270, 275 (2d Cir. 1996) (quoting *United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir. 1988)) (internal quotation marks omitted).  Movants put forth evidence from Black Sea, a neutral party who was conducting due diligence in connection with a proposed loan, that the sale of SDG to Glatz may not have been legitimate.  As Triadou concedes, Glatz is the owner of Triadou's parent corporation, Dkt. No. 170 at 16 n.20, and is thus "closely allied or related to" Triadou. *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 700 (S.D.N.Y. 2014).  As such, he was "peculiarly within [Triadou's] power to produce," and his "testimony would [have] elucidate[d] the transaction" in question, namely the sale of SDG. *Sagendorf-Teal*, 100 F.3d at 275 (quoting *Torres*, 845 F.2d at 1169).  Glatz's testimony, far from being "unnecessary," Dkt. No. 170 at 16, would have gotten at the heart of the issue, namely his financial ability to purchase SDG, in a way that Cerrito's testimony was unable to do.  Because Triadou chose to call Cerrito and not Glatz to discuss Glatz's finances and the sale of SDG, the Court will "draw an adverse inference that . . . [Glatz's] testimony . . . would have been unfavorable" to Triadou by confirming that Glatz lacked the financial ability to purchase SDG.[7] *Sagendorf-Teal*, 100 F.3d at 275.

For this reason, Glatz used funds loaned to him by the Khrapunov family to purchase the company.  Dkt. No. 165 ¶ 132; Bourg Decl. ¶ 33.  As a result of this arrangement, SDG was

---

[7] Triadou suggests that it is improper to draw this adverse inference at this stage. Dkt. No. 170 at 16 & n.20. Although missing witness instructions are usually given in jury trials, Triadou cites no authority suggesting that it is improper for the Court to draw such an inference in deciding a preliminary injunction motion. Courts routinely draw adverse inferences in connection with preliminary injunction proceedings. *See, e.g., John Paul Mitchell Sys. v. Quality King Distributors, Inc.*, 106 F. Supp. 2d 462, 471 (S.D.N.Y. 2000) (adverse inference for invoking Fifth Amendment). Courts also draw missing witness adverse inferences in connection with bench trials. *Donziger*, 974 F. Supp. 2d at 700; *Adelson v. Hananel*, 652 F.3d 75, 87 (1st Cir. 2011). Although there are few cases on missing witness adverse inferences at the preliminary injunction stage, at least one court in this circuit has drawn such an inference, *Lopez v. Delta Funding Corp.*, No. 98-CV-7204 (CPS), 1998 WL 1537755, at *1 n.1 (E.D.N.Y. Dec. 23, 1998, and the Court can find no decision declining to do so on the grounds Triadou advances.

EXHIBIT 1
14

"sold" for a mere CHF 3.5 million (its equity value) when Glatz's investment bank valued the enterprise value of the company at CHF 150 million.  Dkt. No. 165 ¶ 133; Dkt. No. 169 ¶ 133. Khrapunov and his sister did not withdraw their CHF 35-40 million investment from SDG after the purported sale.  Dkt. No. 169 ¶ 194.

### F.    Triadou Assigns Its Interest in the Flatotel Back to the Chetrits

By 2014, Triadou had invested $34,885,565 in the Flatotel project.  Dkt. No. 169 ¶ 165. Bourg, still the director of Triadou at that time, valued Triadou's U.S. assets at approximately $114 million, estimating the Flatotel project alone to be worth $62 million.  *Id.* ¶¶ 119-120. Bourg estimated that Triadou's U.S. assets would grow in value to $179 million.  *Id.* ¶ 121. Bourg informed the SDG Board that the Flatotel investment was worth $100 million.  *Id.* ¶¶ 164, 168; *see also* Tr: 129:12-17.  However, Triadou's interest in the Flatotel was assigned back to the Chetrits for approximately $32 million.  Dkt. No. 169 ¶ 166.  This below-market assignment was motivated by the threat of litigation against the Khrapunovs. [8]  Bourg Decl. ¶ 39-40.

Triadou's alternative explanation, that the Flatotel interest was sold because Triadou did not wish to meet an unexpected capital call, is wholly implausible.  Bourg testified that "if a partner missed a capital call, that partner would either be diluted, or the counterparty could make that capital call instead, which would be treated as a loan at a generous rate," Bourg Rep. Decl. ¶ 4, a description of the terms of the agreement that Triadou does not dispute.  Dkt. No. 169 ¶ 170. Cerrito admitted that SDG, through the assignment, agreed to "give up the investment that it believed was worth $100,000,000 for less than half of that."  Tr. 130:2-5.  Triadou did not present any evidence to suggest that the penalty for missing a capital call was sufficiently severe

---

[8] Although the lawsuit in California was not filed until after assignment negotiations began, Dkt. No. 169 ¶¶ 157, 159, the close temporal proximity between these events and the implausibility of Triadou's explanation demonstrates persuasively that the assignment was motivated by the threat of litigation, not a missed capital call.

EXHIBIT 1

15

to justify assigning its interest in the Flatotel for $2 million less than it had already invested, less than half of its estimated market value, and less than a quarter of its projected value.

**G.   Triadou Attempts to Enforce the Assignment Agreement**

After the assignment agreeement was executed, the Chetrit Entities failed to pay Triadou the $21 million in installment payments owed under the contract. Dkt. No. 110 ¶ 3.  Triadou and the Chetrit Entities are currently engaged in state court litigation on this topic, and the state court has awarded Triadou $10.5 million in judgments. Dkt. No. 103 at 1.  On May 5, 2016, the state court approved a Monitorship Order to which the Chetrit Entities had consented. Dkt. No. 132 & Ex. 1.  Under the terms of the Monitorship, Herman Cahn was appointed a Monitor "for the sole purpose of monitoring the financial transactions of the Flatotel Condominium project and monitoring and collecting all distributions and any other funds to which [the Chetrit Entities] are entitled up to the amount so as to satisfy Triadou's judgments." Dkt. No. 132 Ex. 1 ¶ A.  If Triadou recovers funds from the Chetrit Entities in connection with the 2014 assignment agreement, it will transfer its recovery to its parent, SDG, to invest in real estate projects in Switzerland. Dkt. No. 169 ¶ 56.

**H.   Triadou's Enforcement Efforts Have Not Been Negatively Perceived by the Real Estate Press**

After the Monitorship was imposed by the state court, Movants' expert Lee Eichen predicted that the public would view the Monitorship imposed by the state court, "regardless of the exact details" of that Monitorship, "the same as the appointment of a receiver." Eichen Supp. Decl. ¶ 4.  He also predicted that "the uniform perception of the marketplace, regardless of the exact details of [any monitorship or receivership], will be that the Project is experiencing extreme financial distress." Eichen Decl. ¶ 11.  Contrary to this prediction, the real estate press has, for the most part, accurately reported the terms of the Monitorship.  One articled explained

10

**EXHIBIT 1**

**16**

that "a monitor will have access to the books and will hold onto $10.5 million in sales from Chetrit's condo conversion of the Flatotel" in what the article characterized as an "escrow account." Almaty Ex. 39 at 1.  Another described how "profits from the Chetrit Group's Flatotel . . . [will] be frozen in court." Almaty Ex. 40 at 1.  Yet another noted that "[a] court appointed monitor will hold on to some of the profits from Joseph Chetrit's Flatotel condominium conversation project" and goes on to explain that "[t]he monitor . . . will have access to the books at the condominium project and eventually collect $10.5 million in condo sales" which "will be held in an escrow account." Almaty Ex. 41 at 1.  A final article indicated that the money collected by the Monitor "will be held in escrow." Almaty Ex. 42 at 1.  In addition to reporting the details of the Monitorship, these articles also described the basic allegations against the Khrapunovs and Ablyazov; namely, that they are accused of stealing substantial sums of money from Kazakhstan and then "sought to launder [those funds] in the Flatotel condo conversion." Almaty Ex. 39; *see also* Alamaty Exs. 40-42.

## III.   CONCLUSIONS OF LAW

The Court will first address whether Movants are entitled to the requested preliminary injunction and will then consider the request for an order of attachment.

### A.   Rule 65 Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  A court may issue a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.  In the Second Circuit, a party may demonstrate that it is entitled to such relief in one of two ways. First, he may "show that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor;

11

EXHIBIT 1

17

and that an injunction is in the public interest." *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015). Alternatively, "he may show irreparable harm and either a likelihood of success on the merits or 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Id.* (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012)).

In opposing the pending motion for a preliminary injunction, Triadou first argues that any such relief is barred by the Anti-Injunction Act. Dkt. No. 109 at 4. Second, Triadou argues that Movants have not demonstrated irreparable injury. Dkt. No. 170 at 30. Finally, Triadou argues that Almaty has not demonstrated a likelihood of success on the merits. Dkt. No. 170 at 17.

### 1.    Anti-Injunction Act

The Anti-Injunction Act does not permit a court to "grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. The Supreme Court has twice held that the Anti-Injunction Act does not bar a court from enjoining a party from enforcing a state court judgment if the injunctive relief is sought by "strangers to the state court proceedings." *Imperial Cty. v. Munoz*, 449 U.S. 54, 59 (1980) (quoting *Hale v. Bimco Trading*, 306 U.S. 375, 378 (1939)). The Supreme Court suggested that this is so because state proceedings do not "b[in]d the independent suitor in the federal court as though he were a party to the litigation in the state court." *Id.* (quoting *Hale*, 306 U.S. at 378). Although no court in the Second Circuit has had occasion to evaluate this language, other circuits and treatises have. *See Gottfried v. Med. Planning Servs., Inc.*, 142 F.3d 326, 329 (6th Cir. 1998) ("[T]he Anti–Injunction Act does not bar federal lawsuits filed by individuals who . . .

12

EXHIBIT 1
18

were 'strangers to the state court proceedings.'"); *Chezem v. Beverly Enters.-Tex., Inc.*, 66 F.3d 741, 742 (5th Cir. 1995) ("[T]he Anti–Injunction Act has no application herein because [the movants] were neither parties nor privies of parties to the state court action."); 17A Charles Alan Wright *et al.*, Fed. Prac. & Proc. § 4222 (3d ed. 2007), at 66-67 ("The Anti-Injunction Act does not bar a suit by third parties for an injunction that would nullify an earlier state court judgment . . . if the persons bringing the federal action were 'strangers to the state court proceeding.'").

The Ninth Circuit, however, has addressed this situation in the most detail. In *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867 (9th Cir. 2000), the Ninth Circuit evaluated the "continued vitality" of the so-called "strangers exception" to the Anti-Injunction Act. *Id.* at 879 (internal quotation marks omitted). Noting that no Supreme Court decision had reconsidered the issue since *Imperial County* and that the exception "has been regularly applied" by circuits in recent years, the Ninth Circuit concluded that "[o]ne who is not a party to state proceedings, nor in privity with a party, may seek a federal injunction against enforcement of a judgement obtained in those proceedings." *Id.* at 879-80 (collecting cases). For determining who is a "stranger to the state court proceedings," the Ninth Circuit held that "one who is not bound directly by virtue of a sufficiently close relationship with a party [under preclusion doctrine] is not bound indirectly by the Anti-Injunction Act." *Id.* at 879. This appears to be a faithful application of binding Supreme Court precedent articulated in *Imperial County* and *Hale*, and so the Court will apply that approach here.

Triadou does not argue (nor could it) that Movants are bound by the state court proceedings between Triadou and the Chetrit Entities under any preclusion doctrine. As a result, they are "strangers to the state court proceedings" and the Anti-Injunction Act is no bar to the requested injunctive relief. *Imperial Cty.*, 449 U.S. at 59 (quoting *Hale*, 306 U.S. at 378).

EXHIBIT 1
19

## 2.   Irreparable Harm

"The showing of irreparable harm is '[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction'". *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)). Under this prong, parties seeking a preliminary injunction "must show that, on the facts of their case" and in the absence of the requested injunction, they will suffer a harm that "cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81-82 (2d Cir. 2010).

Movants put forward three arguments on irreparable harm. First, they argue that their claims under CPLR § 5239 "would be extinguished upon enforcement of Triadou's judgments" against the Chetrit Entities. Dkt. No. 166 at 20. Next, they argue that Triadou's enforcement of its judgment against the Chetrit Entities will irreparably harm the Flatotel project. *Id.* at 21. Finally, they argue that Triadou will remove its recovery from the jurisdiction if it succeeds in enforcing its judgment. *Id.* at 22.

### a.   Movants do not establish that Triadou's enforcement efforts will irreparably harm their CPLR § 5239 claims

Movants argue that their CPLR § 5239 claims "will be effectively mooted" if "Triadou is able to collect on its state-court judgments against Chetrit." Dkt. No. 166 at 20. At no point in any of Movants' four briefs in support of its preliminary injunction motion do they point to any authority suggesting that enforcement of a judgment necessarily "moot[s]" or "extinguishe[s]" a claim under CPLR § 5239 to vacate that judgment. *See* Dkt. No. 107 at 6; Dkt. No. 117 at 4-5; Dkt. No. 166 at 20; Dkt. No. 172 at 19-20. Movants' initial brief indicates that their real concern is that their CPLR § 5239 claim will not be viable if the Court vacates the relevant judgment after Triadou has enforced its judgment *and removed those assets from the jurisdiction*.

14

EXHIBIT 1
20

Dkt. No. 107 at 6 ("[A] ruling vacating judgments that have already been enforced would be a nullity, *particularly if Triadou has spirited away any assets collected upon.*") (emphasis added). For this reason, the Court does view this argument as distinct from Movants' asset flight argument, which it will consider separately below.

**b.      Movants do not establish that Triadou's enforcement efforts will irreparably harm the Flatotel project**

Relying on Eichen's testimony, Movants argue that Triadou's enforcement of its judgment against the Chetrit Entities will irreparably harm Almaty and BTA Bank.  Specifically, they argue "that the real estate press will conflate Monitorship and receivership and create an atmosphere of negative publicity about the Flatotel while units are still being marketed," which could scare investors and cause the project to fail.  Dkt. No. 166 at 21.  Movants argue that they will ultimately bear the cost of this injury because the Flatotel is "the very asset that [they] seek to reclaim" in this action.  Dkt. No. 107 at 7.

The evidence in the record refutes Movants' irreparable injury argument.  Multiple real estate press articles, *see* Almaty Exs. 39-42, accurately reflect the "details regarding the scope [and] purpose of the Monitorship," Eichen Supp. Decl. ¶ 4, and do not express any opinion that the Monitorship indicates that the Flatotel project "is experiencing extreme financial distress." Eich. Decl. ¶ 11.  To the contrary, they suggest that the project is profitable, as the articles repeatedly note that only *profits* will be held in "escrow."  Almaty Exs. 39-42.  This evidence demonstrates that there has been no "conflat[ion of] monitorship and receivership."  Dkt. No. 166 at 21.  While there is undoubtedly "negative publicity about the Flatotel" in the "real estate press" that could potentially affect the profitability of the Flatotel, *id.,* this "negative publicity" is focused on the substance of Movants' allegations that the managers of the Flatotel project worked in concert with Ablyazov and the Khrapunovs to launder money, not the Monitorship.

15

EXHIBIT 1
21

Almaty Exs. 39-42.  Because negative publicity of this sort is unrelated to Triadou's enforcement

efforts, Movants cannot demonstrate that they are "likely to suffer" the specific harms associated

with negative press "in the absence of" the specific preliminary injunction requested.[9]  *Clapper*,

785 F.3d at 825.

The Court thus concludes that Movants have not demonstrated that Triadou's

enforcement of its judgment against the Chetrit Entities will irreparably harm the Flatotel project.

> **c.      Movants do not establish that the requested preliminary**
> **injunction is appropriate relief from the potential risk of asset**
> **flight**

Finally, Movants argue that Triadou is likely to move its assets out of the jurisdiction as

soon as it succeeds in enforcing its judgment against the Chetrit Entities.  Dkt. No. 166 at 22.  As

the Court found above, Triadou has conceded that it will transfer any recovery from the Chetrit

Entities to SDG for investment in Swiss real estate.  Dkt. No. 169 ¶ 56.

Movants correctly note that "federal courts have found preliminary injunctions

appropriate where it has been shown that the defendant intended to frustrate any judgment on the

merits by transferring its assets out of the jurisdiction."  *In re Feit & Drexler, Inc.*, 760 F.2d 406,

416 (2d Cir. 1985) (internal quotation marks and alterations omitted).  However, the preliminary

injunctions granted in such cases have been limited to prohibiting the unlawful *transfer* of assets,

not prohibiting the relevant party from coming into possession of any assets for fear of later

unlawful transfer.  *See id.* (a preliminary injunction was granted "to prevent [the defendant] from

making uncollectible any judgment the Trustee may eventually obtain against her); *Republic of*

*Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986) (the preliminary injunction

"prevent[ed] any transfer or encumbrance of . . . properties that would place them beyond" the

---

[9] The Court also notes that, insofar as Movants' concern is the decreased profitability of "the very asset that [they] seek to reclaim," Dkt. No. 107 at 7, they have not demonstrated that any financial harm to the Flatotel project in the form of reduced profitability would be *irreparable*.

EXHIBIT 1
22

reach of the court). Even the cases the Movants cite are limited to preserving available assets, not precluding enforcement of judgments. *See Seide v. Crest Color, Inc.*, 835 F. Supp. 732, 734 (S.D.N.Y. 1993) (party sought to "enjoin the sale" of certain assets); *see also* Dkt. No. 172 at 20-21 (describing injunctions "freezing assets" and requiring "security against a possible future judgment," but not precluding enforcement of judgments).

As the Ninth Circuit has noted, "[p]reliminary injunctive relief should be narrowly tailored, and should be no more burdensome than necessary to preserve a plaintiff's ability to obtain the complete permanent relief to which it is entitled." *State of Cal. v. Am. Stores Co.*, 872 F.2d 837, 845 (9th Cir. 1989), *rev'd on other grounds by* 495 U.S. 271 (1990); *see also Constitution State Challenge, Inc. v. Nyemchek*, No. CIV A. 300CV650 (CFD), 2001 WL 640417, at *7 (D. Conn. June 1, 2001) (finding an injunction "not narrowly tailored to the irreparable harm alleged by the plaintiffs," and, as a result "arbitrary and overly broad."); *Transamerica Rental Fin. Corp. v. Rental Experts*, 790 F. Supp. 378, 382 (D. Conn. 1992) ("In fashioning an injunction, the court should make the relief as narrow as required to attain the desired result."). Neither the Second Circuit nor the Supreme Court have directly addressed this issue. The Supreme Court has, however, cited the Ninth Standard's "narrowly tailored" standard, albeit in passing, without disapproval. *See Winter*, 555 U.S. at 17 ("The appellate court concluded . . . that a blanket injunction . . . was overbroad, and remanded the case to . . . narrow its injunction . . . ."). The Second Circuit and district court decisions cited above further suggest that, when confronted with the alleged irreparable harm of asset transfer, courts are expected to limit injunctive relief to enjoining asset transfer.

In light of authority suggesting that injunctions should be narrowly tailored to the alleged harm, and specifically suggesting that the appropriate relief where the threat of unlawful transfer

EXHIBIT 1
23

of assets is alleged is an injunction against such transfer, Movants have not demonstrated that are entitled to the requested preliminary injunction on the basis of the alleged irreparable harm. Specifically, Movants have not demonstrated that an injunction enjoining Triadou from enforcing its judgment against the Chetrit Entities is necessary to prevent asset flight, particularly where a narrower injunction specifically targeting asset flight is a viable alternative.

Because Movants have not demonstrated that the requested preliminary injunction is "narrowly tailored . . . and no more burdensome than necessary," *Am. Stores.*, 872 F.2d at 845, to prevent asset flight and have not established any other basis for irreparable harm, their motion for a preliminary injunction is denied.

### B.    Rule 64 Attachment

Federal Rule of Civil Procedure 64 authorizes "[e]very remedy . . . that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a).  The rule specifically mentions attachment as an available remedy.  Fed. R. Civ. P. 64(b).  New York's Civil Procedure Law and Rules ("CPLR") permits attachment upon a showing "that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff."  CPLR § 6212(a).  Because Triadou has not brought any counterclaims against Movants, the Court will first consider whether Movants have demonstrated sufficient grounds for attachment under the relevant statute and will then evaluate whether it is probable that they will succeed on the merits.

18

EXHIBIT 1
24

1.   **Movants have demonstrated grounds for attachment under CPLR**
**§§ 6201(1) and (3)**

CPLR § 6201(1) authorizes attachment if "the defendant is a nondomiciliary residing

without the state, or is a foreign corporation not qualified to do business in the state." CPLR

§ 6201(1). This statute "is designed to serve two independent purposes: obtaining jurisdiction

over and securing judgments against nondomiciliaries residing without the state." *ITC Entm't,*

*Ltd. v. Nelson Film Partners*, 714 F.2d 217, 220 (2d Cir. 1983). Even if attachment is

"unnecessary to secure jurisdiction," it may be "appropriate to secure the judgment" against

nondomicilaires. *Id.* However, "[a]ttachment under New York law solely for security purposes

is appropriate only when it appears likely that a plaintiff will have difficulty enforcing a

judgment." *TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 586-87 (S.D.N.Y. 2012)

(quoting *Katz Agency, Inc. v. The Evening News Ass'n*, 514 F. Supp. 423, 429 (S.D.N.Y. 1981)).

In evaluating the question, the Court "must determine whether the defendant has assets within

the State that could satisfy a judgment and whether petitioner's fear that the judgment will not be

satisfied is reasonable." *Id.* (quoting *Moran v. Arcano,* No. 89-CV-6717 (CSH), 1990 WL

96761, at *2 (S.D.N.Y. July 3, 1990)). This can be made by "showing that something, whether it

is a defendant's financial position or past and present conduct, poses a real risk of the

enforcement of a future judgment." *Bank of China, N.Y. Branch v. NBM L.L.C.*, 192 F. Supp. 2d

183, 188 (S.D.N.Y. 2002) (quoting *Meridien Int'l Bank Ltd. v. Gov't of Republic of Liberia*, No.

92-CV-7039, 1996 WL 22338, at *3 (S.D.N.Y. Jan 22, 1996)). However, unlike § 6201(3), §

6201(1) does not require a showing that the risk of an unsatisfied judgment stems from the

party's "intent to defraud . . . creditors or frustrate the enforcement of a judgment." CPLR §

6201(3).

19

EXHIBIT 1
25

Triadou, incorporated under the laws of Luxembourg,[10] has admitted that, if it succeeds in enforcing its judgment against the Chetrit Entities, it will transfer its recovery to its parent, SDG, to invest in real estate projects in Switzerland. Dkt. No. 169 ¶¶ 56, 62.  Triadou's candid admission of its intent to transfer these funds, once obtained, to Switzerland demonstrates "a real risk of the enforcement of a future judgment," *Bank of China*, 192 F. Supp. 2d at 188 (citation omitted), thus showing the requisite likelihood "that [Movants] will have difficulty enforcing a judgment" to satisfy § 6201(1).  *TAGC Mgmt.*, 842 F. Supp. 2d at 586-87.

Movants also meet the more stringent requirements of CPLR § 6201(3), which permits attachment only if "the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts."  Under this provision, unlike § 6201(1), "[r]emoval, assignment, or other disposition of property is not a sufficient ground for attachment; *fraudulent intent* must be proven, not simply alleged or inferred, and the facts relied upon to prove it must be fully set forth in the moving affidavits."  *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 319 (E.D.N.Y. 2009) (citation omitted) (emphasis added).  Because "[f]raudulent intent is rarely susceptible to direct proof . . . courts have developed 'badges of fraud' to establish the requisite actual intent to defraud."  *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983).  Among these "badges of fraud" are:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

---

[10] Triadou does not contest that it is "not qualified to do business in the state." CPLR § 6201(1).

EXHIBIT 1
26

1n

*Id.* at 1582-83.

These "badges of fraud" are apparent in Triadou's 2014 assignment of its Flatotel interest back to the Chetrit Entities. As the Court found, and Triadou admitted, it had invested $34,885,565 million into the Flatotel project, Bourg valued the project between $62 and $100 million, the Board was informed that the project was worth $100 million, but the assignment was consummated for approximately $32 million. Dkt. No. 169 ¶¶ 120, 164-68. On cross-examination, Cerrito admitted that, in this transaction, SDG's Board had agreed to "give up the investment that it believed was worth $100,000,000 for less than half of that." Tr. 130:2-5. Due to Triadou's implausible explanation of this below-market assignment and the temporal proximity between the sale and the initiation of litigation in California, the Court found that the assignment was motivated by the threat of litigation in California. Thus, the "inadequacy of consideration" and "general chronology of events and transactions under inquiry," notably the liquidation of assets in response to the threat of litigation in California, *see In re Kaiser*, 722 F.2d at 1582-83, demonstrate that the 2014 assignment was undertaken with fraudulent intent. As a result, Triadou has, in connection with the California litigation, already "with intent to . . . frustrate the enforcement of a judgment that might be rendered . . . assigned property" (its Flatotel interest) and has attempted, through its enforcement efforts in New York, to "remove[] . . . from the state" the consideration due on that assignment agreement. CPLR § 6201(3). This evidence, coupled with Triadou's stated intent to the assets in question in this litigation from the jurisdiction, further demonstrate that Triadou will "do . . . these acts" again in connection with the instant litigation. *Id.*

For the foregoing reasons, the Court finds the statutory grounds for attachment described in both CPLR § 6201(1) and CPLR § 6201(3) to be satisfied.

EXHIBIT 1
27

>2.    **Movants have demonstrated a probability of success on the merits**

In addition to satisfying § 6201, a party must also demonstrate "that it is probable that [it] will succeed on the merits" before a motion for attachment may be granted. CPLR § 6212(a). Triadou argues that Movants have not demonstrated a probability of success on their RICO, unjust enrichment, or conversion claims. Dkt. No. 170 at 17-21. Triadou further argues that attachment is not appropriate on Movants' fraudulent conveyance claims. *Id.* at 22. Because the Court finds that Movants have demonstrated a probability of success on their unjust enrichment claim, it need not consider Triadou's other arguments.

To prevail on an unjust enrichment claim, "[a] plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (internal quotations and alterations omitted). Triadou argues that Movants fail to meet these requirements because "the UK Judgments have no evidentiary value" and "Almaty/BTA have not adduced sufficient evidence linking Telford . . . to Ablyazov." Dkt. No. 170 at 21. The Court, rejecting these arguments, found above that the UK Judgments are entitled to weight and that Telford is an Ablyazov investment entity used to move Ablyazov funds. As a result, the only arguments Triadou advances against Movants' unjust enrichment claim fail.

The evidence submitted by Movants unquestionably demonstrates "that it is probable that the [they] will succeed on the merits" of their unjust enrichment claim. CPLR § 6212(a). Triadou was enriched when it acquired a 37.5% interest in the Flatotel project with $34,885,565.00 in funds obtained from Telford. Dkt. No. 169 ¶¶ 83, 92, 165. This enrichment was at Movants' expense, as Ablyazov had embezzled between $3 and $4 billion from BTA

EXHIBIT 1
28

Bank, Almaty Ex. 22 ¶ 3; Almaty Ex. 34 ¶ 11, and used Telford as an entity "to conceal and move his funds." Bourg Decl. ¶ 10. It would be "against equity and good conscience to permit" Triadou to retain either the value of the money paid on its behalf by Telford or the profits from its assignment of that same 37.5% interest, *Wildenstein*, 944 N.E.2d at 1110, because Triadou, like SDG and Telford, was "used to conceal the movement and investment" of Khrapunov and Ablyzov funds. Bourg Decl. ¶¶ 6-7; *see also Amusement Indus., Inc. v. Midland Ave. Assos., LLC*, 820 F. Supp. 2d 510, 537 (S.D.N.Y. 2011) (finding unjust enrichment where defendants "improperly obtained possession of a portion of" an escrow account and "knew that they were being given [plaintiff's] money"); *Eastman Kodak Co. v. Camarata*, No. 05-CV-6384 (DGL), 2006 WL 3538944, at *15 (W.D.N.Y. Dec. 6, 2006) (finding unjust enrichment where defendant "knowingly furthered [a] scheme to defraud by means of money laundering, and . . . in so doing . . . was enriched through her receipt of substantial sums of money.").

As a result, Movants meet the requirements for attachment under CPLR § 6212(a).

### 3.    The Court will not exercise its discretion to deny the motion for attachment

Finally, Triadou asks the Court to exercise its discretion to deny the motion for attachment "if the Court also dismissed Almaty/BTA's Crossclaims on *forum non conveniens* grounds." Dkt. No. 170 at 29-30. Because the Court did not dismiss Movants crossclaims on *forum non conveniens* grounds, the Court will not deny the motion for attachment on that basis. Instead, for the reasons above, the Court grants Movants' motion for attachment.

## IV.    CONCLUSION

Because Movants have not demonstrated that an injunction preventing Triadou from enforcing its judgment against the Chetrit Entities is necessary to prevent any irreparable harm, its motion for preliminary injunction is denied. However, because Movants have demonstrated

EXHIBIT 1
29

that attachment is appropriate under CPLR §§ 6201(1) and 6201(3) and that it is probable that they will prevail on the merits of their unjust enrichment claim, their motion for attachment is granted.

Triadou shall submit any objections to Movants' proposed order of attachment on or before June 29, 2016. Also by June 29, 2016, the parties shall meet and confer and submit a proposed amount for Movants' undertaking.

This resolves Dkt. Nos. 106, 140.

SO ORDERED.

Dated: June **24**, 2016
New York, New York

_____
ALISON J. NATHAN
United States District Judge

EXHIBIT 1
30