

**Exhibit 2**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBERS LLC, and THE CHETRIT GROUP, LLC, | ECF Case |
|         Interpleader Plaintiffs, | No. 15 CV 05345 (AJN) |
|     - against - | |
| TRIADOU SPV S.A. and CITY OF ALMATY, a foreign city, | |
|         Interpleader Defendants. | |

| |
|---|
| CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC, |
|         Crossclaim Plaintiffs, |
|     - against - |
| MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A., |
|         Crossclaim Defendants. |

## <u>AFFIDAVIT OF CESARE CERRITO</u>

I, CESARE CERRITO, hereby declare as follows under penalty of perjury:

1.     I am an Italian national, and currently reside in Switzerland.  I attended the University of Genoa, where I studied Business Administration.  I then received my Master's in corporate finance from the SDA Bocconi School of Management. After my education, I worked in equity capital markets and corporate finance, before transitioning to work in real estate finance and private equity investment.

2.     Since November 2009, I have been the Chief Financial Officer (CFO) of Swiss

EXHIBIT 2
31

Development Group ("SDG").  Since 31 October 2014, I also have been the sole director of

Triadou SPV S.A. ("Triadou"), one of SDG's subsidiaries.  In my role as SDG's CFO, I worked

closely with Ilyas Khrapunov from November 2009 and until the sale of SDG in March 2013 to

Mr. Philippe Glatz.  Since March 2013, I have worked closely with Mr. Glatz in every aspect of

operations and management of SDG and its subsidiaries.  As such, I have a thorough

understanding of all aspects of SDG's operations, finances, and investments from November 2009

through present day.

### I.   The Origin of SDG

3.    SDG was incorporated in July 2008, and I joined the company in

November 2009.  The initial funding for SDG came from Ilyas Khrapunov and his sister,

Elvira Kudryashova, who was a shareholder of SDG.  Thereafter, SDG raised several

mortgages and construction loans from major Swiss banks, and issued several rounds of

bonds purchased by bona-fide third parties, including certain Swiss banks. The overall

funding raised by SDG over the entire period of my tenure that came from Ilyas Khrapunov

and his sister constitutes a minor portion of the total funds raised.  Most recently, SDG raised

fresh bank financing in the amount of $16.5 million USD.

4.    At the time that I joined SDG, Ilyas Khrapunov was the Chairman and

remained so until June 2012, at which time he became an adviser to SDG's Board until the

sale to Mr. Glatz.  I understand that Ilyas Khrapunov became an adviser due to the negative

press surrounding his family, which was hindering SDG's ability to do business.  During the

period before Mr. Glatz purchased SDG (November 2009 to March 2013), I frequently met

with Ilyas Khrapunov in various working meetings and during SDG Board meetings.  During

this period, I observed that Ilyas Khrapunov took the advice of management and other Board

EXHIBIT 2

32

members – including Marc Gillieron, Nicolas Garnier, Christian Grandjean, and Jean-Francois Garneau – in reaching decisions that would steer the company.

5.      At no point did I observe, nor was I aware of, any involvement of, consultation with, or decisions made by Viktor Khrapunov or Mukhtar Ablyazov in connection with the business of SDG, and to my knowledge, no one else at SDG was aware of any decisions being made by either of those individuals either.

## II.      The Formation of Triadou

6.      In or about 2011, SDG's Board decided to create a real estate fund to invest in luxury real estate across the world (the "Fund").   The Fund was initially named "SDG Investment Fund," and later renamed "Element One."   The decision to create the Fund came out of the intention to specialize SDG as a development company providing services to owners of assets, rather than owning assets itself.   In or about July 2011, SDG retained the services of Nicolas Bourg as an outside consultant to head the Fund project.   Mr. Bourg had two major mandates:

- To incorporate the Fund and the management company in Luxembourg, and to take care of all registration and approval formalities, particularly with Luxembourg's Commission de Surveillance du Secteur Financier ("CSSF"). Mr. Bourg assured SDG management (as described above) of his ability to complete this task in less than one (1) year, and we therefore expected that the Fund would be up and running by mid-2012. Attached as Exhibit 1 is a true and correct copy of the 8 March 2012 agenda of the international real estate investment conference (MIPIM) (publically available at http://www.mipim.com/RM/RM_MIPIM_v2/ documents/pdf/mipim/MIPIM-2012-events-calendar-March1.pdf).[1] As

---

[1] I note that while SDG did not prepare the MIPIM "Events Programme" attached as Exhibit 1, it is a true and correct copy of what was issued by MIPIM.  That said, the document mistakenly identifies Mr. Nicolas Garnier as Chairman of SDG; at the time, Mr. Garnier was CEO of SDG, while, as stated above, Ilyas Khrapunov was Chairman of the Board.

EXHIBIT 2
33

can be seen, the Fund was already being announced and marketed at the time.

- In parallel with the registration activities, Mr. Bourg was tasked with marketing the Fund, seeking out seed investors to put up money for the Fund, and seeking out potential investments for the Fund so that it could deploy money as soon as it was launched.

7.      Mr. Bourg failed to establish the Fund by mid-2012, and the situation was still unresolved by September 2012.  By that time, Mr. Bourg already had incurred significant expenses – all paid for by SDG – for researching a number of potential investments, such that not investing would have resulted in negative financial consequences.  Also by that time, Ilyas Khrapunov had lined up another investor, Mr. Gennady Petelin (described below), who remained interested in the potential investments even though the Fund's creation was delayed.

8.      By September 2012, SDG's Board decided that SDG and Mr. Petelin would proceed to invest in those projects found by Mr. Bourg, while SDG and Mr. Petelin waited for the Fund to be incorporated.  Then, once the Fund was established, both SDG and Mr. Petelin would contribute the investments "in kind" into the Fund and become the shareholders of the Fund. Mr. Bourg recommended that the "interim" investments should be made through Special Purpose Vehicles (SPVs) incorporated in Luxembourg because they could be made tax-efficient and it would later facilitate "in kind" contributions into a Luxembourg-domiciled Fund.  It was in this context that SDG incorporated three (3) wholly-owned SPVs in October 2012:  Porto Heli SPV S.A., Igloo SPV S.A., and Triadou.

**III.    Funding from Telford**

9.      As noted above, one of the investors Ilyas Khrapunov identified for the Fund was his sister's father-in-law, Mr. Petelin, who expressed an interest in the project.  In October 2012, Ilyas Khrapunov and Mr. Petelin agreed that Mr. Petelin would provide debt

EXHIBIT 2
34

financing to Triadou to invest in U.S. real estate projects.

10.     Since Triadou was a wholly-owned subsidiary of SDG, it was my duty to conduct know-your-customer diligence on Mr. Petelin.  In this context, I reviewed documents demonstrating several transactions engaged in by companies owned by Mr. Petelin, one of which was an investment in a significant oil-and-gas asset from which Mr. Petelin netted several hundred million USD.  Based on the documents I reviewed, I independently verified through the Internet that the named companies were engaged in real transactions with major international investors.  Finally, I reviewed documents on the entity that would provide the funding to Triadou, known as Telford International Limited ("Telford").  These documents showed that Telford was 100% owned by Telford Trust, which in turn belonged to Mr. Petelin's wife, Elena Petelina. Attached as Exhibit 2 is a true and correct copy of the Deed of Trust of Telford Trust that I reviewed during my diligence of Mr. Petelin showing Elena Petelina as the beneficiary.

**IV.    Triadou's Investment in the Flatotel Project**

11.     In or about early November 2012, Triadou invested in the Flatotel condominium project (the "Flatotel") by entering into an operating agreement for CF 135 West Member LLC.  Under the terms of this agreement, Triadou would provide 52.5% of all the equity for the project, but would be entitled to 37.5% of the profit.

12.     Nicolas Bourg states in his affidavit that he received a fee from the Chetrits at the time that Triadou initially invested in Flatotel.  At the time, I did not know, and to my knowledge, no one else at SDG knew, that Mr. Bourg was going to receive some form of direct payment from the Chetrits for the Flatotel project, and the deal documents did not in any way provide for such a payment to Mr. Bourg.

EXHIBIT 2
35

### V.    The Sale of SDG to Philippe Glatz

13.    Sometime in late 2012, Ilyas Khrapunov was tasked by SDG's shareholders to approach investors who might be interested in purchasing SDG.  He approached Mr. Glatz, whom he knew through their mutual involvement in the Christian Democratic People's Party of Switzerland.   My understanding of the relationship between Ilyas Khrapunov and Mr. Glatz is that of business acquaintances. To my knowledge, they do not meet socially, and based on the interactions I have observed, I would not describe the two individuals as "friends."

14.    Mr. Glatz is a well-known Geneva businessman, who also has investments in Brazil and France.  In Geneva, he owns one of the largest private hospitals and has business interests in aeronautics, packaging, and real estate.   Although I am not privy to all of Mr. Glatz's finances, I understand, based on working with him for the past three years and on publically available information, that Mr. Glatz's finances were and are sufficient to have purchased SDG and to have continued to support it through the present day.

15.    Ilyas Khrapunov formally made the offer to sell SDG and its subsidiaries to Mr. Glatz in late December 2012.  Mr. Glatz expressed interest, and the due diligence and deal negotiation process commenced in early January 2013 and closed on 25 March 2013. Mr. Glatz hired an investment bank to conduct the due diligence and prepare a valuation, and retained his own lawyers to work on the deal documents.  During that time, Mr. Glatz held multiple meetings with Ilyas Khrapunov and the SDG Board.  Based on my 15 years of experience as an investment professional, the transaction was undertaken with all the rigor of a bona fide, arms-length deal.

EXHIBIT 2
36

16.     The purchase of SDG by Mr. Glatz involved the purchase of 100% of the equity in SDG Capital SA by Mr. Glatz's company, Greencos S.A.  I am not aware, and to my knowledge, no one else at SDG was aware, of any arrangement between Ilyas Khrapunov and Mr. Glatz under which Mr. Glatz purchased SDG with funds loaned to him by Ilyas Khrapunov.  In contrast, I know that the sale to Mr. Glatz received intense scrutiny from the Geneva Prosecutor and the Swiss banks investing with SDG, and the purchase was allowed to proceed.

17.     Since purchasing SDG, Mr. Glatz has provided several million Swiss Francs of his own funding to support the business.  SDG itself holds several real estate investments in Switzerland that far exceed the value of the money owed to Triadou by the Chetrits as a result of the August 2014 Assignment Agreement.  SDG also has investments from, and accounts with, various financial institutions in Switzerland, including La Compagnie Privée de Conseils et d'Investissements S.A.

18.     As to the $21 million USD owed to Triadou by the Chetrits, when that money is recovered, SDG intends to invest it in one of several current real estate projects it has in Switzerland.

**VI.**     **Mr. Glatz's Control of SDG and the Role of Ilyas Khrapunov after the Sale**

19.     In my experience, it is common practice that when someone purchases a privately held business, they require certain managers of the business to remain after the sale to assist with the transition of ownership, particularly when those managers have in-depth knowledge about the business.  Here, it is my understanding that Mr. Glatz made it a condition of the purchase of SDG that for two (2) years following the sale, Ilyas Khrapunov had to remain available as an adviser to the Board, to participate in meetings when so

EXHIBIT 2
37

requested, and to assist Mr. Glatz in interfacing with any partners/counterparts with whom Ilyas Khrapunov originally held the relationship.  These requirements were included in the SDG Stock Purchase Agreement ("SPA").

20.      While Ilyas Khrapunov remained an adviser, all decisions made at SDG after the sale to Mr. Glatz were made and authorized either by Mr. Glatz personally or, in most cases, by the Board of SDG.

21.      Since Mr. Glatz purchased SDG, I have observed Mr. Glatz's active involvement in every aspect of SDG's business, including the investments into U.S. real estate through Triadou.  Because the Board of SDG was so actively involved in its management, between April 2013 and the present day, SDG held more than 60 Board meetings. I have been present at most of these meetings, and I was copied on the circulation of the minutes for every meeting.  I can confirm based on my attendance at these meetings and my review of the minutes for meetings that I did not attend that Mr. Glatz was present at the majority of these Board meetings and took part in discussing the assets and business matters of SDG.

22.      I also personally have had many working meetings and calls with Mr. Glatz in which he instructed me to take certain actions or prepare for him specific information in connection with the management and operations of SDG and its subsidiaries.  Since the sale, Ilyas Khrapunov has not been in charge of making payments, disposing or purchasing assets, or anything other than advising the SDG Board and management.

23.      As regards Triadou and its U.S. real estate investments, I can confirm that these matters were discussed at multiple SDG Board meetings, including some at which Mr. Bourg was present.  Attached hereto as Exhibits 3 and 4 are true and correct copies of

EXHIBIT 2
38

minutes of the Board meetings of SDG held on 26 June 2013 and 6 February 2014.  As can be seen on pages 3-4 of Exhibit 3, and on pages 4-5 of Exhibit 4, Mr. Bourg spent a significant amount of time reporting to Mr. Glatz and the SDG Board the status of the Fund and the U.S. investments, including Flatotel.  The minutes also reflect that Mr. Bourg received instruction from SDG's Board, which included Mr. Glatz.

24.     I also understand that Mr. Bourg had a number of working meetings with Mr. Glatz on the subject of the Fund and concerning the U.S. investments. I was not present at any of these meetings.

**VII.   Triadou's Assignment of Its Flatotel Ownership Interest**

25.     In March and April 2014, the Chetrits informed Triadou that a further capital call was needed from all equity partners in the Flatotel project.  While I do not know who specifically with the Chetrits provided this information, I was informed about the capital call by Mr. Bourg's assistant Kevin Meyer in March or April 2014.  Shortly thereafter, Triadou informed the Chetrits that it did not wish to participate in this capital call.  As a result, the Chetrits offered to buy out Triadou's membership interest in CF 135 West Member LLC. The Chetrits initially approached Ilyas Khrapunov with the buyout offer, and asked him to introduce the offer to Mr. Glatz, as the Chetrits did not know Mr. Glatz at the time. Upon consultation with Mr. Glatz, Mr. Bourg was authorized to negotiate a buyout and commenced such negotiations in April 2014.  In late April 2014, Mr. Bourg and Triadou's attorney met with the Chetrits and their attorneys to discuss the structure of the buyout.  An email setting forth the agenda for that meeting is attached hereto as Exhibit 5.  Furthermore, I understand the meeting occurred because SDG received a report of the meeting from counsel.

EXHIBIT 2
39

**VIII.  SDG's Termination of Mr. Bourg**

26.     As previously mentioned, Mr. Bourg was tasked with incorporating and registering the Fund by mid-2012.  By March 2013, when Mr. Glatz purchased SDG, Mr. Bourg still had not been able to complete his tasks with respect to the Fund.  Mr. Glatz, as SDG's new owner, allowed Mr. Bourg more time.  Despite these extensions, Mr. Bourg still was unable to register the Fund.

27.     While working for Triadou, however, Mr. Bourg improperly spent SDG's money.  Attached as Exhibit 6 is a true and correct copy of an email I sent to Mr. Bourg on 8 April 2014 (with a translation following).  Among those copied is Marc Gilliéron, who was at the time the Chairman of SDG.  Exhibit 6 summarizes the expenses incurred by Mr. Bourg and his team over the years of "trying to form the Fund."  While some of expenses were legitimate business expenses and fees of external service providers, others were not.  Mr. Bourg regularly traveled in First Class (or by private plane or helicopter), and stayed in 5-star hotels at the expense of SDG, including a nine-day "business trip" to New York in which Mr. Bourg invoiced SDG for over 22,000 Swiss Francs for staying at the Four Seasons and multiple visits to the spa.

28.     Mr. Bourg was fired as a result of Mr. Glatz's lack of confidence in him resulting from Mr. Bourg's failure to timely register the Fund, his improper expenditures, and other concerns.  I understand that it was Mr. Glatz who decided to fire Mr. Bourg, not Ilyas Khrapunov.

EXHIBIT 2
40

Cesare Cerrito



I, Laurent BRECHBUHL, notary public in Geneva/Switzerland, hereby certify the signature affixed hereover by Mr. Cesare CERRITO.
Geneva, May 11th, 2016.



BRECHBUHL & RODRIGUEZ
NOTAIRES
38, route de Malagnou - Case postale 401
1211 GENEVE 12
Tél. +41 22 707 15 00 - Fax +41 22 735 05 56
E-mail   notaires@brnotaires.com

11

EXHIBIT 2
41

# EXHIBIT 1

EXHIBIT 2
42



# THURSDAY, MARCH 8TH

## 2012 EVENTS PROGRAMME

### MIPIM EVENTS

**PM**

**13.00 - 14.00**
• Hotel & Tourism Lunch *By invitation only
*Sponsored by Jones Lang LaSalle Hotels – Majestic - Dinard*

• Spanish Lunch *by invitation only
*Gray d'Albion - 4 Saisons*

**14.30 - 15.00**
• Fos Distriport Logistics zone : high capacity, high potential
*Org: Ports de Marseille - Pisano room, Level 01, Aisle 2*

**14.30 - 15.30**
• Press Conference: The launch of a new real estate investment fund: the reasons of an extraordinary success
*With Nicolas Garnier Chairman of Swiss Development Group and Nicolas Bourg CEO of the investment fund – Press conference room, Press Club, Level 01, Aisle 1*

• More affordable homes: design and build, finance and deliver
*Co-org: UK Regeneration - Hoban room, Level 3*

• The Netherlands: hot spots, hot segments
*Gaudi room, Level 01*

• Energy efficiency: new & refurbished projects
*Le Corbusier room, Level 01*

**15.00 - 15.30**
• Northern logistics hub to CEE
*Org: EUROBUILD - Pisano room, Level 01, Aisle 2*

**15.00 - 16.00**
• Keynote address: Henri Giscard d'Estaing, Chairman & CEO, Club Med The future of hotel development - key success factors for new hotel and resort projects and the growth of hotel groups
*Co-org: PKF hotelexperts - Auditorium A, Level 3*

**15.30 - 16.00**
• Link-In The Netherlands "Meet the key players"
*Gaudi room, Level 01*

• Industrial real estate developer as value creator – Panattoni Europe
*Org: EUROBUILD - Pisano room, Level 01, Aisle 2*

**16.00 - 16.30**
• The benefits of a diverse industrial portfolio
*Org: EUROBUILD - Pisano room, Level 01, Aisle 2*

### PARTICIPANTS' EVENTS

**A-M**


**11.00**
• Plaine Commune, territoire de la culture et de la création : quels enjeux pour les grands projets immobiliers ?
*Org: Plaine Commune - Stand Paris Region – MAR PR04*

• Investment Renewable Energies
*Org: Stuttgart - Stand H4.18*

**11.00 - 11.20**

**11.00 - 11.30**
• Schwabinger Tor –an economic factor for Munich
*Co-org: City of Munich - Riviera Hall - Stand : R33.08*

• Business Headquarters and creation of a Metropolitan Area - Coktail
*Co-org: Pole Metropolitain Strasbourg-Mulhouse, France – Stand 03.02 - 05.01 , Level 01*

• New destinations for Tegel & Tempelhofer Freiheit
*Org: Berlin - Stand H4.28*

**11.00 - 11.30**
• New destinations for Tegel & Tempelhofer Freiheit
*Co-org: City of Berlin - Level 4 – Stand : H4.28*

**11.00 - 11.45**
• Bordeaux Euratlantique, Left Bank: Bordeaux Saint-Jean / Belcier business district takes shape.
*With Bernard Reichen (Reichen et Robert & Associés agency), for the Saint-Jean / Belcier project. – Org: Bordeaux Euratlantique - Stand 03.02 - 05.01 - Level 01*



**11.00 - 12.00**
• From an ancient armament factory to an ecological village.
*Org: New Market S.A. «RIE-NIED-NRG» – Agora room, Level 01*

• BC «Felicitas» in historical place of Saint-Petersburg.
*Sponsored by FELICITA LLC – Stand:12.16 - Level 01*

• Tokyo, the business Portal of Asia
*Org: Tokyo Metropolitan Government – Palais des festivals, Riviera Hall, Stand R33.24*

**11.00 - 13.00**
• City of London Seminar
*Org: City of London - Auditorium K, Level 4*

**11.30**
• Harbour logistics and river transport: a major issue
*With Gilles FOURNIER, Chairman of supervisory board of Port of Le Havre Authority; Roger ANDERSON, Regional Chair and CEO, the Regional Municipality of Durham Region; Jérôme GIRAUD, Head of business development, Grand Port Maritime de Marseille (Port of Marseille authority) – Gaudi room, Level 01*

**11.30 - 12.30**
• Romania - Private Investement for Urban Transformation
*Co-org: Gruppo Scarpellini - Lerins Hall - Stand : RSV 05*

• Lyon - Confluence
*Org: Lyon – Communauté urbaine - Riviera Hall - Stand : R 31-02*

**11.30**
• «City lights» cocktail reception. Project to restructure the Pont de Sèvres towers in Boulogne-Billancourt (Hauts-de-Seine). Model exhibited at the stand.
*With Philippe Zivkovic, Chairman of the BNP Paribas Real Estate, Pierre-Christophe Baguet, Mayor of Boulogne-Billancourt, Dominique Perrault, Project Architect
Org: BNP Paribas Real Estate – Paribas Real Estate stand*

• Rendez-vous Paris Batignolles Aménagement :
*Org: Paris - Stand Paris Region, MAR PR15*

EXHIBIT 2
43

# EXHIBIT 2

EXHIBIT 2
44

## AGREEMENT FOR THE PROVISION OF NOMINEE SERVICES

Trust Name: **The Telford Trust**
Registered in Belize

Date: 26th March 2012

Between

**Elena Petelina** of House 6, Apt. 43, Volzhskiy Blvd., Moscow, Russian Federation, holder of Russian Federation passport number 63 No4552265 - shall be defined as the physical person(s) entitled to benefit from the property held by the above trust and duly managed and outsourced administrated by the Agent/or Administrator below, (hereinafter referred to as "Beneficiary" and/or "Beneficiaries")

AND

**Agences des Directeurs Agrée**, Siege Sociale, Route Digue, Antananarivo 101, Madagascar duly represented by Zoulficar Djoma acting as the Administrator (hereinafter referred to as "the Administrator")

AND

**Mamadrafik Rosanaly** of Lot II B57, Mahalavolona, Antananarivo, Madagascar holder of France passport number 04RE28821, acting as Nominee (hereinafter referred to as "the Nominee" and/or "the Nominees").

**WHEREAS**

**CONSIDERING THAT**

1) the Beneficiary is the ultimate beneficiary of the trust and gives fully detailed written instructions to the Administrator; and the Beneficiary in consideration is interested, and entitled to all interests and rights of The Telford Trust (hereinafter referred to as the Trust).

2) the aforesaid Beneficiary is the absolute beneficiary of the trust and entitled to be registered as beneficiary.

**NOW THIS DEED** made in pursuance and in consideration of the Parties, witnesses as follows:

1) The Beneficial Owner(s) has requested from the Administrator to appoint **Mamadrafik Rosanaly** holder of France passport number 04RE28821, to act as Nominee beneficiary of the Trust on his/her behalf and in this capacity perform acts and actions as may be requested by him/them from time to time.

2) It is herewith agreed that the Administrator and/or Nominee **will act as specifically instructed by the Beneficial Owner(s) only** or authorised by law representatives and not on his/her own account. The Nominee will only act as requested or notified by the Beneficial Owner(s) upon written instructions only, which should be given in conformity with the **laws of Belize**. The Beneficial Owner(s) who among other things undertake to ratify all steps taken by the Nominee in execution of his/their instructions, fully

Page **1** of **5**

EXHIBIT 2
45

indemnifies the Nominee who is authorised to act as the Signatories of the Beneficial Owner without proof of the signatures of the Beneficial Owner(s) and the Nominee shall be discharged from any liability towards the Beneficial Owner(s). The Beneficial Owner(s) undertake/s the responsibility to give any information which may be asked by the Nominee from time to time. The Nominee and Administrator reserve the right to take legal actions against the Beneficiary in case of breach of this agreement. The Beneficial Owner(s) undertake/s to make prompt payment when due for all fees and expenses payable to the Administrator and Nominee in respect of such services. If the fees are not settled in the agreed terms, the Administrator and Nominee are entitled to withdraw from their abovementioned position and their resignation will be filed with the appropriate state authorities, giving at the same time the right for both the Administrator and the Nominee to claim compensation and/or damages for the amounts due.

3) The Nominee accepts to act in this capacity and to act as hereinafter provided for, good and valuable consideration.

4) It is herewith further agreed that the Administrator and Nominee do not have direct beneficial interest and/or ownership and/or any right or privilege over the property of the Trust.

5) The Beneficial Owner(s) further declare/s, guarantee/s, warrant/s, confirm/s and agree/s to abide and to be bound by the Terms and Conditions contained in the present Agreement that will also bind his/their respective executors, Administrators and successors in title.

6) The Administrator and Nominee will act only as requested or notified by the Beneficial Owner(s) or their authorised representatives. Their written instructions should be given in conformity with the Laws of Belize. These instructions may be given by facsimile, e-mail, and scan copy by e-mail, courier or letter. The Beneficial Owner(s) agree/s, represent/s, warrant/s and undertake/s responsibility to give any information regarding these instructions asked for by the Administrator or Nominee without any delay of time.

7) The Administrator and Nominee shall be entitled to require from the Beneficial Owner(s) or their authorised representatives to give or confirm any direction or instruction in writing at their discretion and may refrain from acting until written direction or instruction is received. The Administrator and Nominee shall be entitled to rely on any communication or document (including any cable, telex or facsimile message scan copy by email, courier, letter) believed to them to be genuine and correct and to have been communicated or signed by them on behalf of the Beneficial Owner(s) or their authorised representatives and shall not be liable to the Professional Intermediary for any consequences of such reliance.

8) General Terms: -

(a) Any disbursements incurred by the Administrator and/or Nominee will be chargeable as and when they occur, including couriers, official fees, time spent on general or accounting enquiries from official bodies;

(b) The Administrator and/or Nominee will retain the power to refuse to sign any documents which, in his/their opinion could cause confusion, are misleading or could be unlawful or such instructions are improper, invalid, illegal, unauthorised or unreasonable;

Page **2** of **5**

EXHIBIT 2
46

(c)     Annual renewal invoices will be sent in advance and failure to discharge the fees will result in the Administrator's and Nominee's resignation giving at the same time the right for both the Administrator and the Nominee to claim compensation and/or damages for the amounts due;

9)     This Agreement may be rescinded by the Beneficial Owner(s) at any time. In this case, the Nominee shall perform all necessary actions and sign all necessary documents within 21 calendar days in order to substitute the Beneficial Owner as the new Beneficiary of the Trust in lieu of the Nominee Beneficiaries.

10)     This Agreement may be terminated by the Nominee in case the Beneficial Owner(s) is/are in breach of any of the Terms and Conditions of the present agreement. In such an event, the Nominee may take all necessary actions to resign from all posts. Also, the Nominee reserves the right to terminate this agreement for any reason, provided that he gives 21 calendar days notice in writing (by facsimile, e-mail, scan copy by email, courier or letter) and holds the right to take legal actions against the Beneficiary.

11)     This Agreement may not be amended, modified or supplemented, and no waivers of or consents to or departures from the provisions hereof may be given, unless consented to in writing by the two parties hereto.

12)     This Agreement may be executed in two or more counterparts and/or by facsimile, scan copy by email, each of which shall be deemed an original, but all of which shall constitute one and the same Agreement

13)     Beneficial Owner(s) guarantee/s, warrant/s, undertake/s and agree/s as follows:

(a)     To hereafter keep the Nominees fully indemnified from and against all loss or damage which Nominees may at any time incur or have incurred or sustain or have sustained arising out or in connection with the provision of such services or by reason of any act, deed, matter or thing done or omitted by Nominee in the capacity as nominee beneficiary of the trust (other than any act, deed, matter or thing done or omitted to be done in contravention of the laws and regulations of Belize) or a lawful direction given to Nominee by Beneficial owner's officials and against all actions, proceedings, claims, costs and expenses whatsoever arising there out or in connection therewith at all times.

(b)     To fully indemnify Nominees and hold them harmless against any past, pending or future claims of whatever nature and none excluded, exercised by third parties for damages incurred as a result of the performance and their duties as a Nominee Beneficiary, unless such damages result from gross negligence or full misconduct by the Nominees. The indemnity granted to Nominees will include object to the same restrictions all damages, losses, fines, costs, amounts paid in settlement, expenses and legal fees Nominee may incur at any time.

(c)     Not to give to the Nominee or cause any of his officials to give to the Nominee any directions which are unlawful under the Laws and regulations of Belize or where such directions are to be carried out or which would give rise to any liability to the Nominee as aforesaid.

Page 3 of 5

EXHIBIT 2
47

(d) That the Nominee may terminate the assumed obligations and resign from his positions and appoint the Beneficial Owner(s) instead. If the Beneficial Owner(s) or other persons acting on his/their behalf fail to fulfil the obligations set forth herein, and violate any requirements of the national and international legislation.

(e) That the Nominee may act upon any direction or consent received by or notified to the Nominee from the Beneficial Owner(s) or through one of his/their dully authorised officials without inquiry.

(f) That the Beneficial Owner(s)  shall make prompt payment of all fees payable to the Nominees when due, in respect of such services.

(g) That the agreement and obligations on the Beneficial Owner's part herein contained, shall be binding on his respective executors, administrators and successors in title.

(h) All the Nominee's acts and deeds must take effect by the written instruction of the Beneficiary.

14) This Agreement shall be governed, construed, validated and exercised in accordance with the laws of Belize, and all disputes which may arise under, out or in connection with or in relation to this Agreement, shall be referred to the exclusive jurisdiction of the Courts of Belize.

15) All terms of this agreement are essential.

16) The Beneficial Owner(s) fully warrant/s, guarantee/s, agree/s and acknowledge/s that he/they has/have sufficient information and full acceptance of the **TERMS AND CONDITIONS** provided to him/them by the Nominee Beneficiary(ies) and/or Administrator.

17) The Nominee and Beneficial Owner understands that this agreement is subject to compliance with the terms of the Trust and in particular understands that the Trustee may add or exclude beneficiaries at their total absolute discretion in accordance with the terms of the Trust.

18) All parties confirm that the contents of this agreement has been translated and explained to them in their native language, and they fully understand and comprehend the Terms and Conditions of this Agreement. Furthermore, all parties confirm that they have read and understood the contents of this agreement, and they also took the opportunity to consult its content, with a lawyer of their choice, and agree that it accurately reflects their fair understating of the services that will be undertaken and that they freely, voluntarily and in full comprehension of the same, enter into and sign the present Agreement.

Page 4 of 5

EXHIBIT 2
48

IN WITNESS WHEREOF this Agreement has been signed by the duly authorised representatives of the parties of The Telford Trust, registered in Belize.

---

Signed and Agreed by the **Beneficial Owner(s):**          Witness:

Signature _Petelina_          Signature _____
          Beneficial Owner

Signed by: **Elena Petelina**          Signed by ......................

Passport No.: **63 No4552265**          Passport No.: ..................

---

Signed and Agreed by the Nominee:          Witness:

Signature _____          Signature _Fidaly_
          Nominee

Signed by: **Mamadrafik Rosanaly**          Signed by ...........................

Passport No.: **04RE28821**          Passport No.: .....................

---

Signed and Agreed by the **Administrator:**          Witness:

Signature _____          Signature _____
          Administrator

Signed by: **Zoulficar Djoma**          Signed by PEERALY...HASSANALY Nachila

Passport No.: **A07T14628**          Passport No.: ........................

---

Page 5 of 5

EXHIBIT 2
49

# RAMSAY INTERNATIONAL SA

1st Floor, Dekk House, Zippora Street
Providence Industrial Estate, Mahe, Seychelles

26 March 2012

Elena Petelina
House 6
Apartment 43
Volzhskiy Blvd.
Moscow
Russian Federation

Dear Ms Petelina

Please find attached deed of trust drafted by us and duly signed by the beneficiary of Telford Trust for your perusal.

Kindly note the Deed of Trust will be submitted to FBME Bank Limited as part of the requirements to open a bank account for the underlying company of the Trust, Telford International Limited.

Should you have any queries, please do not hesitate to contact us.

Yours sincerely

Zoulfical Djoma
For and on behalf of
Ramsay International SA

EXHIBIT 2
50

# DEED OF TRUST

I, **Mamadrafik Rosanaly** of Lot II B57, Mahalavolona, Antananarivo, Madagasgar

HEREBY ACKNOWLEDGE AND DECLARE that I hold

**All my rights as beneficiary of The Telford Trust, a trust registered in Belize**

Registered in my name as Nominee of and Trustee for

**Elena Petelina** of House 6, Apt. 43, Volzhskiy Blvd., Moscow, Russian Federation (Passport 63 No4552265)

(hereinafter called "the owner") and I UNDERTAKE AND AGREE not to transfer deal with or dispose of the said Rights save as the Owner may from time to time direct and further to give full effect to the trust hereby declared. I further UNDERTAKE AND AGREE to account to the Owner for all Benefits which may be provided to me from time to time upon the said Rights and for all other monies or profits which may be payable to me in respect thereof AND I FURTHER AGREE AND UNDERTAKE to exercise my voting power as Beneficiary of the said Rights in such a manner and for such purposes as the Owner may from time to time direct or determine.

In any event, the trustees may add or exclude beneficiaries at their total absolute discretion in accordance with the terms of the Trust.

Dated this 26th day of March 2012

Signed:

**Mamadrafik Rosanaly**

EXHIBIT 2
51

# EXHIBIT 3

EXHIBIT 2
52

---

**MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS**

**SDG CAPITAL SA**

(the "Company")

**26 June 2013**

---

Participants:

| | |
|---|---|
| Marc GILLIERON | Chairman |
| Philippe GLATZ | Director |
| Bernard KATZ | Director |

Attending:

| | |
|---|---|
| Cesare CERRITO | CFO |
| Jean-François GARNEAU | CEO |
| David GAYMARD | Executive Director Development and Acquisitions |
| Nicolas BOURG | Consultant |
| Kevin MEYER | Senior Analyst |
| Agnès COSSU | Chabrier Avocats |

The meeting opened on 26 June 2013 at 2:10 pm at the seat of the Company.

\* \* \*

1. **OPENING**

   1.1. **Chairman and Secretary**

   Mr. Marc GILLIERON took the chair, noted that the quorum was present and confirmed that the Board of directors might validly deliberate.

   The Chairman appointed Ms Agnès COSSU as secretary, who accepted. He then reviewed the agenda.

   1.2. **Approval of minutes of previous meeting**

   The board reviewed the draft minutes of the meeting of 6 June 2013. The board resolved to approve it.

   \* \* \*

   The board decided unanimously to slightly change the sequencing of the items of the agenda for organisational reasons but the layout of the present minutes shall comply with the initial sequencing of the agenda as submitted to the board.

2. **MANAGEMENT**

   2.1. **Review of current regulations**

   The board decided to postpone the review of the current regulations to the next board meeting.

**CONFIDENTIAL**

EXHIBIT 2
53

3. **REVIEW OF INVESTMENT FUND**

Mr. Nicolas BOURG gave an overview of the current projects of the fund and the status of the registration of the fund.

Mr. Nicolas BOURG explained that the CSSF, the Luxembourg financial regulation body, had required that the future General Partner provide a business plan to be more precise on the contemplated operations, which was done accordingly. No other issue was raised by the CSSF for the time being. The outlook is positive and the outcome should now only be a matter of weeks.

Mr. Kevin MEYER further explained that the team is now working on the setting up of the structure itself to allow the Fund to be created smoothly after authorization by the CSSF, which should not take long. He reckons that the structure should be in place by late July.

Mr. Philippe GLATZ enquired on the expectations of investments. Mr. Nicolas BOURG replied that the outlook is good and investments are going well on the 2 main projects sponsored by SDG Capital: Igloo and Porto Heli.

Igloo

The Letter of Intent from investors was received for a 50% stake which implies that Mr. L. FOUCHER's stake shall not be diluted. This investment enables the Company to cash-in fees in the amount of EUR 2,000,000 as project manager.

The Chairman inquired on the chance for this to close. Mr. Nicolas BOURG confirmed that the counterparty is reliable. The closing is scheduled for a date in 3 weeks' time.

Mr. Kevin MEYER further explained that the initial works started which is a good signal for investors and for the potential lender, Crédit Foncier. Mr. Nicolas BOURG explained that most compliance issues have been addressed with Crédit Foncier and that the Chairman of Crédit Foncier with whom Mr. Bourg has had contact, approves of Credit Foncier financing a part of the project. Mr. Nicolas BOURG further explained that he obtained from the potential lender a verbal agreement for a minimum of a EUR 10,000,000 loan (that is the amount of what has already been invested in the project) provided that the Company is able to provide a 50% equity for 50% loan by Crédit Foncier. Mr. Nicolas BOURG confirmed that following the Board decision as communicated by the Chairman by email to Kevin MEYER on 17 June 2013, to allocate up to EUR 800'000 to the project, there should be enough cash to finance works until September.

Porto Heli

The Chairman enquired on the two Memorandums of Understanding to be entered into with Dolphin Capital Investors Ltd ("Dolphin"). Mr. Nicolas BOURG explained that Dolphin's Porto Heli Nikki Beach project, in which the Company has already invested CHF 4,200,000, belongs to a wider global portfolio of projects known as the "Porto Heli Collection". The "Porto Heli Collection" includes the Amanzoe project relating to the existing Amanzoe Hotel and its luxury seafront villas. This Amanzoe hotel is already profitable, thanks to the strong Aman brand, and its products are successful.

The "Porto Heli Collection" portfolio also includes the "Chedi and Jack Nicklaus Signature Golf Course", which is a golf course conceived by renowned golf player and golf course designer Jack Nicklaus, and includes a hotel and 260 seafront villas.

Mr. Nicolas BOURG explained that the 3 projects actually enhance each other's value and potential. Furthermore, based on the Porto Heli Nikki Beach project experience, one can say that Dolphin is a reliable partner and that the partnership with Swiss Development Group (Alberto Hervello) has worked well.

2

**CONFIDENTIAL**

EXHIBIT 2
54

The contemplated deals are to enter into the said projects at a lesser value than that in the books of Dolphin. Mr. Nicolas BOURG reckoned that within 5 years, the yield should be 4 times the initial investment, in addition to the 25% stake in the hotel which shall also be profitable. As far as the golf project is concerned, the Company would acquire shares at a lesser value than that in the books of Dolphin and at half the price recently granted to Rosewood Hotels and Resorts. This good value is granted by Dolphin because SDG is a strategic partner to Dolphin. He confirmed that the vehicle for these acquisitions should be Porto Heli SPV SA, in Luxembourg.

Mr. Nicolas BOURG also explained that a new Greek legal frame provides the granting of a residence permit for the purchaser of a residential real estate asset from a certain value. This new legal provisions are particularly attractive to some investors, in particular Chinese citizens, and provides a solid customer base for the residential elements of the projects.

USA projects

Mr. Nicolas BOURG then introduced the 4 projects in the USA:

- The Flatotel project: the hotel went bankrupt in the past years, was acquired in order to to be converted into residential units, restaurants and office spaces. The Company owns a 37.5% stake. Brokers have shown a keen interest on the project, and as soon as the permit is granted (in the course of November), brokers should be involved to sell the residential units on plan. Mr. Nicolas BOURG reckoned that the project should be then sold out within 6 months with a significant profit for the owners.

- The Tri-County Mall in Cincinnati: the Company acquired a distressed loan for an amount of USD 28,350,000 for a note of a face value of USD 200,000,000 and with a planned exit in one year time. Current NOI of the mall already represents a 20% yield on this project.

- The Cabrini project: the building is a former hospital next to Gramercy Park in Manhattan, to be converted into high-end residential units. The Company, through its subsidiary Triadou SPV SA, has invested USD 6,000,000 (a 12% stake) which after capital raises will represent up to USD 12,000,000 invested by fund investors.

- The Syracuse project: this is a 100% stake acquisition, through Triadou SPV SA, of a 50 km$^2$ campus in Syracuse (NY) due to foreclosure (with no pending debt), for an amount of USD 2,200,000 (corresponding to the reserve price of the auctions sale). The concept is yet to be found but an agreement could be reached with a foreign state willing to set up a university, a research pole or an industrial project. The risk is close to nought.

MM. Nicolas BOURG and Kevin MEYER concluded that such high value projects shall be very attractive to future potential fund investors and compensate partly for the lack of track record of the fund. Furthermore, the General Partner shall receive a share of 20% on any profit above 9% IRR. This could prove very profitable considering that the Company owns a 75% stake in the General Partner. Mr. Nicolas BOURG explains that the team has been focused on obtaining the CSSF's agreement for the fund in order for it to be a regulated investment vehicle. This oversight by the Luxembourg regulator is an additional guarantee to investors, and it also enables substantial tax advantages.

4. **REVIEW OF CURRENT PROJECTS**

    4.1. **Sales Review**

51°: The works are currently suspended and should start again in the fall. Project Plan de Quartier has been approved, finally, and subject to standard one month recourse. There have been marketing endeavours for the summer season and construction signage and hoarding is to be installed in July, the showroom will be refreshed and on a go-forward basis act as a capture point. Although it is

3

**CONFIDENTIAL**

EXHIBIT 2
55

expected the clientele will be targeted Russian, it is important to have a local presence. Prioject pricing will be aggressive for first units. The current revised pricing has involved much value engineering of the project to achieve costs that are more in line with market. There has also been a focus on building contacts with the local community. Renewed marketing efforts will focus on new website, ad campaign and potential roadshow in Moscow from September.

Saasfee: the works are still suspended. Discussions are still ongoing with UK group interested in buying entire project.

Edelweiss: the acquisition of the land is finalised and the transfer of ownership from M. FOURNIER to the Company is in progress. Attention is now focused on completing the *plan de quartier*. MM. Garneau and Gaymard will be meeting with M. Fournier to finalize set-up of SPV Ours resort. It is expected the Plan de Quartier process will take anywhere from 18 to 24 months.

Devol SA: SDG is currently awaiting the "pre-avis positif" from the authorities, after which the application for permit will be deposited. Marketing activities, creation of small website and brochures underway.

Igloo: the issue is to safeguard the permit. To this end, the negotiated construction contract is to be signed GTM Annecy Pays de Savoie SAS.

Crans-Montana: the preliminary studies concluded potential for a resort hotel development. The first drafts seem acceptable. At this stage, before going any further, management suggests meeting informally with the authorities, to validate potential next steps. Because the purchase price of the land is attractive it is agreed to explore further. M. Garneau has briefly discussed the project with The Fund as an investment opportunity for them.


### 4.2. Financing

51°C:

Mr. Cesare CERRITO advised that Thermal Developments 2 SA is to issue bonds for the financing of the project. As the subscriber would be a foreign bank, he enquired whether this issuance would raise any LFAIE issues.

The Chairman advised that this would potentially raise some LFAIE issues. The solution could be to dispatch the issuance between two entities. He also advised that a ruling should be asked for to the LFAIE authorities on a no-name basis in order to have it approved in principle. He further advised that it could be confirmed to the LFAIE authorities that the financing does not affect whatsoever the control of the company and a exemption could be applied for. If the project is approved as a commercial project by the cantonal LFAIE authorities, then there should not be any issues. The granting of a *plan de quartier* is a positive first step. The city of Leukerbad could also issue a letter confirming that the project is commercial. Mr. David GAYMARD confirmed that the permit for phase II could be obtained promptly.

Based on this, Mr. Cesare CERRITO proposed a bridge financing but he was confirmed that some money is expected from Igloo SPV SA in the amount of EUR 10,000,000 in the next three weeks.

The Chairman advised that the confirmation from the city of Leukerbad that the project is commercial should be obtained as soon as possible, and that financing would be decided accordingly.

Edelweiss: the financing amounts to CHF 7,000,000 for which a shareholder's loan is expected.

Devol SA: expenses shall be born by Devol SA.

Igloo: the amount for works as of 31 July 2013 is of EUR 250,000 before tax. But these expenses have already been provisioned for. The amount of EUR 1,400,000 shall be disbursed in February 2014 but by this time, the project will be financed by the fund.

4

CONFIDENTIAL

EXHIBIT 2
56

5.   REVIEW OF HOTEL DU PARC

   5.1. **Sales Review**

There have been 2 sales since the last board meeting. An additional one is about to be concluded and another one is pending subject to the incorporation of its acquisition vehicle. Mr. Jean-François GARNEAU confirmed that the sovereign fund is still interested in the penthouse but the fund is rather focused on the 51°C project.

Works have been handicapped by late mayments of last few months, however have resumed. On the critical path, discussions are ongoing with the millwork subcontractor who has slowed down the construction once again.

   5.2. **Financing**

This issue was not addressed as an independent item.

6.   REVIEW OF BOND ISSUANCE

   6.1. **Introducing**

The Chairman gave a brief update of bond issuances of the Company.

   6.2. **Subordination Agreement**

He confirmed that the Company obtained the subordination from Compagnie Privée de Conseils et d'Investissements SA of its claims in the amount of CHF 60,000,000.

   6.3. **Status**

There shall be not other bond issuance in the near future.

7.   FINANCE

   7.1. **Review of status**

Mr. Cesare CERRITO gave an overview of the current situation in particular with Banque Sarasin & Cie. The loan that would be granted by Deutsche Bank in London would enable to find a way out with Banque Sarasin & Cie.

The pending issue with Deutsche Bank in London is that of valuation. The target of the Company is CHF 125,000,000. Deutsche Bank in London commissioned CBRE for the valuation survey but CBRE is not favourable choice for the Company. Nevertheless CBRE delivered a marketing plan some years ago for the Company, so CBRE could not give any adverse opinion.

Mr. Cesare CERRITO confirmed that, should negotiations with Deutsche Bank in London fail, then the Company would be insolvent. He also confirmed that the notice is too short to find an alternative financing with another bank. Furthermore, a contractual clause in the agreement with Deutsche Bank in London, actually prohibits negotiations with other banks for a period of 45 days upon the signing of the term sheet. But the attendants agreed that the outlook is positive as the valuation is the only blocking issue in the negotiations.

5

**CONFIDENTIAL**

EXHIBIT 2
57

- Intra-group write-off of claims:
    - Claims of the Company against the subsidiaries in the amount of CHF 20,000,000: this should be an extraordinary income for the subsidiaries that should have a tax impact for them.
    - The above waivers would be an additional loss for the Company. The amount of CHF 28,000,000 should be injected as equity in order to ensure financial balance. This is exactly the amount of claims that Greencos SA and Daniyel KHRAPUNOV have against the Company. Greencos SA should capitalise its claims and Mr. Daniyel KHRAPUNOV should waive his claims. The accounts would then be reorganised in order to solve the capital loss situation but the cash flow issue would remain. The Company would then have to find some solutions to inject some cash unless some sales of Du Parc close within 3 weeks.
    - In order to avoid any negative impact of the debts of the Company on the new share subscription by Greencos SA, the share capital of the Company should be decreased to CHF 0 and then successively increased to the amount of the subscription by Greencos SA.

The above measures should be submitted for approval by the general meeting once the 3% stake of Mr. Nicolas GARNIER in the share capital of the Company is transferred to Greencos SA.

Mr. Philippe GLATZ noted that the operational charges amount to CHF 7,000,000 p.a. which is substantial and that cost-cutting measures should be considered. The board discussed the fact that charges could be decreased by CHF 1,500,000 p.a. This should be done after the summer in a way that the Company should not be destabilised. Focus should be on increasing performance levels in order to boost motivation, in particular in the new positive context of the group.

*The board of directors resolved to approve the above financial reorganisation measures.*


### 7.3. Funding Requirements

This issue was not addressed as an independent item. The above resolution of the board of directors was communicated to the officers during the meeting.


## 8.   WRAP UP AND CLOSE

### 8.1. Next Board Meeting

The next Board meetings are the following:

- 18.07.2013 - 2pm;
- 03.09.2013 – 2pm.

### 8.2. Close

There being no further business the Chairman brought the meeting to a close at 4:50 pm.

The Chairman                                    The Secretary

6

**CONFIDENTIAL**

EXHIBIT 2
58

# EXHIBIT 4

EXHIBIT 2
59

MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS

SDG CAPITAL SA

(the "Company")

6 February 2014

Participants:

| | |
|---|---|
| Marc GILLIERON | Chairman |
| Bernard KATZ | Director |
| Philippe GLATZ | Director |

Attending:

| | |
|---|---|
| Jean-François GARNEAU | CEO |
| Cesare CERRITO | CFO |
| David GAYMARD | Executive Director Development and Acquisitions |
| Nicolas BOURG | Consultant |
| Kevin MEYER | Analyst |
| Agnès COSSU | Chabrier Avocats |

The meeting opened on 6 February 2014 at 10:00 am at the seat of the Company.

\* \* \*

1. **OPENING**

   **1.1. Chairman and Secretary**

Mr. Marc GILLIERON took the chair, noted that the quorum was present and confirmed that the board of directors might validly deliberate.

The Chairman appointed Ms Agnès COSSU as secretary, who accepted. He then reviewed the agenda.

   **1.2. Approval of minutes of previous meeting**

The minutes of the previous meeting held on 29 January 2014 were approved.

\* \* \*

2. **OVERVIEW AND FUNDING REQUIREMENTS FOR THE GROUP**

Mr. Philippe GLATZ informed the board that some investors were to invest the amount of CHF 10,000,000.- according to the needs of the Company.

The Chairman gave an overview of the situation of J. Safra Sarasin bank (the "Bank"). He confirmed that the Bank agreed on the proposed terms and proposed schedule up to October 2014, without any additional requirement.

He confirmed that the amount of CHF 18,000,000.- was necessary to complete Hôtel du Parc. Consequently, taking into account the above investments, there would yet be a CHF 2,500,000.- shortfall, exclusive of the group's Opex and the funding of the other projects. He then confirmed that the deal with Deutsche Bank in London was no longer necessary though negotiations would continue until the bank was ready to close.

**CONFIDENTIAL**

EXHIBIT 2

60

Mr. Bernard KATZ enquired whether all those endeavours were viable as the Opex was high, the level of sales was low, the other projects were to be funded too. He enquired whether the outlook could possibly clear up.

The Chairman replied that as far as the liability of the directors of the Company was concerned, this was limited as the board had always done all its best and diligent endeavours to inform the Bank objectively on the situation of the Company and to protect the creditors of the Company. He then added that as far as the situation itself was concerned, this was still a challenging situation but all possible actions were taken in order to solve it.

Mr. Philippe GLATZ was in the opinion that the Igloo project should be sold away and that the board should ascertain the willingness and competence of the officers to achieve this. He was in the opinion that this should be entrusted to an external expert. The Chairman indicated that the project should be clearly allocated to either Mr. Nicolas BOURG or the officers as there had been some overlaps on this project and that the board of the Company should have full authority on this project. The board agreed that this situation should be sorted out during the meeting.

M. Bernard KATZ stressed out the lack of reporting from the officers on some important actions such as the trip to China for which the board had not received any feedback.

The Chairman confirmed that the officers had been very active on marketing actions and that there had been an increasing interest over the past year. He confirmed that once the works are completed, the situation should clear up. As the situation with the Bank was settled, the focus should be on completing the works. The outstanding amounts should be paid to contractors and a financial reserve should be allocated to ensure advance payments to contractors in order to restore their confidence and to prevent any legal mortgage that would automatically terminate the deal with the Bank. The Board agreed that risks of any future legal mortgage should be closely monitored.

\* \* \*

Then the officers joined the meeting.

\* \* \*

Mr. Cesare CERRITO gave an overview of the current situation. He confirmed that the funding requirements were substantial for February 2014. Two scenarii were discussed for resuming and completing the Hôtel du Parc project.

He also highlighted the various funding requirements to be considered for the group's running costs, and overdue costs in other projects. In particular was highlighted the 51 ° project, for which payments have been stopped since September 2013, and although the management team understood the Hôtel du Parc project as the ultimate priority, it was also in their opinion that in order to maintain the value of the investments, some payments would have to be made to keep potential lawsuits at bay, and set the stage for the project continuation. The exercise of the option on the lands for Phase 2 was discussed, representing an amount of CHF 3,500,000.- required for late April. MM. GAYMARD and GARNEAU indicated that they were meeting with the Bourgeoisie in order to negotiate another extension, although the board was also informed that this being the third extension, the Bourgeoisie had indicated there would be no more extension. In all cases a meeting was set for 13 February 2014 in Leukerbad. It was noted that the support documentation did not include the amount of CHF 3,500,000.- relating to the pre-emption right for phase II. Negotiations were ongoing with UBS to address this issue.

The management team informed that some downsizing in the SDG group was ongoing and that efforts were deployed to that effect. 7 people had been let go so far. The management team informed that discussions had taken place and the Company could henceforth share its premises with Adlux Group thus vacating two full floors of premises. Mr. Cesare CERRITO reminded the board ongoing discussions with the landlord, who was expected to accept this continuation of lease, would

2

CONFIDENTIAL

EXHIBIT 2
61

likely enable the Company to maintain offices on the premises if, and only if, the outstanding rent invoices were settled.

He also recalled the coming payment of the coupon relating to the note.

### 3.   HOTEL DU PARC AND FUNDING REQUIREMENTS

#### 3.1.  Review of Incoming Funding

The board enquired whether there had been any new deals or sales since the last board meeting. Mr. Jean-François GARNEAU confirmed that there had not at this time.

The board confirmed that the CHF 10,000,000.- loan should be paid by instalments with a first down-payment allowing to cover the expenses for February and March 2014.

#### 3.2.  Review of Outstanding Payments

The Chairman informed the officers that the risks of potential legal mortgages had from then to be closely monitored and reported to the board without any delay.

As far as the new legal mortgage issued by LMT for an amount of CHF 300,000.- was concerned, this had to be lifted without delay while fully complying the legal applicable procedure: payment against written waiver from the creditor.

The board informed the officers that the Company should take a new stance towards third parties in order to prove itself a company that meets its commitments rather than a failing company.

***The board required that the officers convene all the pending creditors of Hôtel du Parc in order to inform them that there had been some new funding that allowed the works to resume to completion and that the outstanding payments should be paid immediately.***

The adviser was in the opinion that the officers provide a synoptic table showing all the pending risks of legal mortgages to be updated regularly in order to prevent any single risk of legal mortgage. The board agreed to this.

#### 3.3.  Funding Requirements

Mr. Jean-François GARNEAU confirmed that, in order to complete the works, CHF 25,000,000. were required, including CHF 7,000,000.- overdue, CHF 12,000,000.- cost to complete (except penthouse) and CHF 6,000,000.- for penthouse base-build fit-out, which would be committed only when a purchaser is found.  The overdue amount of CHF 7,000,000.- could possibly be covered with the proceeds of the sale of unit 4 if the negotiation with the Bank had a positive outcome.

### 4.   SARASIN DEAL AND ALTERNATIVE FUNDING

#### 4.1.  Deutsche Bank in London

Mr. Cesare CERRITO informed the board that, following the current situation, the bank required some further updated information. The deadline to complete the dossier internally was set to the coming Friday.

Even though the funding needs changed in the meantime thanks to the new agreement with the Bank and the future funding from external investors in the amount of USD 10,000,000.-, the board agreed that negotiations should continue and that a decision should be made once the bank is ready to close. The board agreed that the final deadline for closing should be set to late March 2014.

**CONFIDENTIAL**

EXHIBIT 2
62

### 4.2. Sarasin Bank

The board informed the officers that, following their latest proposal received the same day, the officers should send the same day a letter confirming the agreement.

### 4.3. Other sources of funding

This item was not addressed independently.

## 5. OTHER PROJECTS

### 5.1. Status of other projects

Igloo Project

The board enquired on the status of the project. Internally, Mr. Cesare CERRITO and David GAYMARD were dealing with the project, currently discussing with Mr. MARTINI, a broker whose services were retained for the purpose of finding construction financing, as well as providing information to a dataroom set up for the use of BNP Paribas bank, which was carrying out its due diligence audit. The management team confirmed that the works were stopped but that a funding was sought urgently. A meeting with BNP Paribas was imminent. It was also reported that Banque Postale showed some interest for a pooling with BNP Paribas.

***The board required a termsheet in order to ease the sale and to make some added-value to the project.***

The board enquired on some current prospects who had demonstrated interest in buying the project. The officers confirmed that they were to send a proposal for EUR 20,000,000.- net for the project. The adviser was in the opinion to commission a real estate broker for this sale such as Jones Lang Lasalle. He also advised to position the product (residence vs hotel). The sale had to be done before spring-time when works actually resume. If the sale could not be concluded before then, then the product would lose some of its appeal and value.

Mr. Jean-François GARNEAU reminded the board that currently the outstanding payments had stopped not only the construction works, but also the finalizing of the project development. More delays could put the project schedule at risk.

***The board confirmed that any opportunity of sale, including direct sales should be considered in order to sell as soon as possible. The board also confirmed that the officers should lead the project.***

\* \* \*

Then MM. Nicolas BOURG and Kevin MEYER joined the meeting.

Mr. Nicolas BOURG gave an overview of the pending projects.

Registration of the fund:

Mr. Nicolas BOURG indicated that he recently met with all the concerned parties for the registration except from officers of the CSSF. He confirmed that the CSSF required additional information. Consequently, failing to receive the agreement of the CSFF within 5 days, Mr. Nicolas BOURG would commission a new legal counsel who would be better known to the CSSF in order to smooth out the process to completion. Apart from the Igloo project, all the projects of the fund were fully equity-financed. He highlighted that a solution was to be sought for as the current situation with the Company was not comfortable and that the absence of a regulated entity would also raise some tax issues as there would be some cash-in from May 2014.

4

**CONFIDENTIAL**

EXHIBIT 2
63

He confirmed that alternatively, the fund could be registered in Malta.

Porto Heli Project

The project still needed equity in the amount of EUR 5,100,000.- to be fully financed, and had been subject to some delays in payment from the Company. There had been a proposal of purchase of a portion of the 75% stake, but this failed to close. Alternatively, Dolphin Capital proposed to grant a loan to SPV 5 Ltd in the amount of EUR 5,100,000.-, with a 11% interest rate p.a and a one year maturity with a payment in arrears, annually renewable with the agreement of all parties. As a guarantee, the shares of SPV 5 Ltd held by SPV Porto Heli SA and Dolphin Capital would be pledged, and liberated on a pro-rated basis following reimbursement. This would enable to fund the project to completion without having to contribute additional equity until the project is soldstarts yielding positive cash-flows.

*The board agreed to the subscription of a EUR 5,100,000.- loan by SPV 5 Ltd according to the terms set above.*

Igloo Project

Mr. Nicolas BOURG confirmed that a EUR 25,000,000.- loan was necessary to complete the project. He also confirmed that so far approximately EUR 14,000,000.- had been invested and that an additional EUR 10,000,000 equity contribution was necessary.

He confirmed that he had a discussion with a debt broker for a EUR 8,000,000.- loan with Banque Espirito Santo et de la Vénétie, but that this amount would not be sufficient to finalise the project, and that the counterpart bank would most likely request a first lien on the asset; further financing would hence require a refinancing . He indicated that he had to commission a debt broker as banks such as Crédit Foncier actually declined.

He stressed that a partner should be sought for a 50% equity stake or alternatively the project would have to be sold off entirely.

The adviser was in the opinion to subscribe a EUR 5,000,000.- loan with the above bank in order to clear the debts with GTM and to provide some value to the project.

*The board instructed Mr. Nicolas BOURG to negotiate with the bank for at least EUR 5,000,000.- loan and to try to get a discount on the commission for the broker.*

The Chairman confirmed that the sale would go through Jones Lang Lasalle. The aim was to sell as soon as possible at a price ranging from EUR 15,000,000.- to EUR 20,000,000.- net (for a 100% stake). Mr. David GAYMARD also stressed the need to discuss the matter with Six Senses.

*The board confirmed that MM. Nicolas BOURG and Kevin MEYER had to coordinate constantly and at any time with the officers of SDG Capital SA for the purpose of the sale of the Igloo project.*

* * *

### 5.2. Funding Requirements

This item was not addressed independently.

### 5.3. Sale of Thermal Development SA

The Chairman reviewed the memo issued by Chabrier Avocats hereto attached that highlighted the possible options for the purchase of units according to the LFAIE restrictions. He also advised that the layout of units (*Propriété Par Etage - "PPE"*) should be completed beforehand and this should take some time. He contemplated a sale to be concluded on the basis of a provisional PPE to be determined at the later stage provided that the purchaser was a Swiss or E.U. national.

5

**CONFIDENTIAL**

EXHIBIT 2
64

Mr. David GAYMARD informed the board that there had been an issue pending relating to the encroachment on an adjoining land which is the property of the municipality, preventing the completion of the PPE. The municipality agreed to the sale of such plot of land at the price to be determined but in the vicinity of CHF 100,000.-. The officers were to meet the notary, as well as the representatives of the Commune and the Bourgeoisie the following week regarding this matter. The parcel needed to be surveyed, agreed to by the parties, then transferred upon payment for the PPE to be finalized.

The Chairman confirmed that as a way round to this issue, a reservation rather than a promise to sell was to be executed.

The Chairman also confirmed that the potential buyer would like to purchase from 1 to 3 units hence the project would henceforth have full self-financing potential (excluding the amount for the purchase of the adjoining plot of land).

### 5.4. Governance of Igloo SPV SA and SPV Megève 1 SCI

This issue was not addressed.

## 6. MISCELLANEOUS

### 6.1. Overall review and rules of communication to third parties

This issue was not addressed.

## 7. WRAP UP AND CLOSE

### 7.1. Next Board Meeting

The next Board meeting was scheduled for Wednesday 5 March 2014 at 3pm.

### 7.2. Close

There being no further business the Chairman brought the meeting to a close at 12:10 pm.

_____
The Chairman

The Secretary

6

CONFIDENTIAL

EXHIBIT 2
65

# EXHIBIT 5

EXHIBIT 2
66

**From:** Kevin Meyer [mailto:km@e-1.lu]
**Sent:** vendredi 25 avril 2014 16:23
**To:** Cesare Cerrito
**Cc:** Nicolas Bourg
**Subject:** Triadou rough numbers


Dear Cesare,

These numbers are for indicative terms, on which we will start the negotiation, have have **not** yet been agreed upon with Chetrit.


**Flatotel**

- Triadou current participation:
  - 37.5% of current asset
  - Invested $ 34'885'565.00
  - Approx. USD 5-6 million capital call outstanding
- Proposed transaction
  - Acquisition by Chetrit of the 37.5% participation
- Terms to be negotiated **(Not yet agreed by Chetrit!)**
  - Cash :$ 34'885'565.00
    - Installment 1: USD 5 million within 1 months
    - Installment 2: USD 5 million within 2 months
    - Installment 3: USD 10 million within 5 months
    - Installment 4: USD 14.885 million within 10 months
  - Trailing Flatotel project profit participation of Triadou of 5-10%


**Cabrini**

- Triadou current participation:
  - USD 6'000'000 note
- Proposed transaction
  - Reimbursement by Chetrit of the USD 6 million within 1 week
  - Interest on note TBD
  - Money to go directly to SDG Capital, loan between SDG and Triadou to be put in place


Kevin Meyer - Element One

+41 78 637 52 49


*The information contained in this communication is fully confidential and intended for the named recipient(s) only. In case you are not an intended recipient, you are hereby (a) strictly forbidden from copying, distributing this email or taking any further action relating to it, and (b) kindly requested to notify the sender and delete any copies immediately. We undertake no responsibility for the accuracy, completeness and absence of virus in this communication or any of its attachment(s). Unless otherwise stated, any views or opinions presented herein are solely those of the author. This email is intended for informational purposes only and is not a solicitation or offer to buy or sell any participation or financial instruments.*


**CONFIDENTIAL**

EXHIBIT 2

67

# EXHIBIT 6

EXHIBIT 2
68

**From:** Cesare Cerrito [mailto:cc@sdg.ch]
**Sent:** mardi 8 avril 2014 17:31
**To:** Nicolas Bourg
**Cc:** Marc Gilliéron; Kevin Meyer; Hélène Le Marchand
**Subject:** Montant dû par Element One au 31.03.2014

Cher Nicolas,

Comme discuté lors de notre dernier meeting, tu trouveras ci-joint les montants dû par Element One au groupe SDG (SDG CAPITAL SA et SDG SA).

| CALCUL DES FRAIS A REFACTURER AU FOND EN 2014 (sur période 2012-2013-2014) | | | | | |
|---|---|---|---|---|---|
| | | | | Including correction | * Credit note & Cash received |
| Amount due by Element ONE as of 31.03.14 | CHF | Paid as of 31.03.14 | Not Paid as of 31.03.14 | Paid as of 31.03.14 | Not Paid as of 31.03.14 |
| **SDG CAPITAL** | 1'707'947.05 | 1'426'177.20 | 281'769.85 | 1'426'177.20 | 223'165.25 |
| FUND (NB Management, Travels, Lawyers & Consulting) | 1'554'069.51 | 1'272'299.66 | 281'769.85 | 1'272'299.66 | 223'165.25 |
| Interests on FUND until 31.12.2013 | 64'896.00 | 64'896.00 | | 64'896.00 | |
| Interests on FUND until 31.03.2014 (provision) | 23'000.00 | 23'000.00 | | 23'000.00 | |
| VAT non recoverable | 65'981.54 | 65'981.54 | | 65'981.54 | |
| VAT non recoverable 2014 (provision) | - | - | | - | |
| **SDG SA** | 407'024.29 | 407'024.29 | - | 407'024.29 | - |
| Telephone NB 2012 | 17'404.00 | 17'404.00 | | 17'404.00 | |
| Telephone NB 2013 | 30'629.00 | 30'629.00 | | 30'629.00 | |
| Telephone NB 2014 | 6'029.67 | 6'029.67 | | 6'029.67 | |
| Telephone KM 2013 | 5'075.00 | 5'075.00 | | 5'075.00 | |
| Telephone KM 2014 | 785.25 | 785.25 | | 785.25 | |
| Telephone Bilal 2013 | 1'201.00 | 1'201.00 | | 1'201.00 | |
| Telephone Bilal 2014 | 743.20 | 743.20 | | 743.20 | |
| Salary KM | 140'326.95 | 140'326.95 | | 140'326.95 | |
| Expenses KM | 20'092.22 | 20'092.22 | | 20'092.22 | |
| Parking NB | 7'560.00 | 7'560.00 | | 7'560.00 | |
| MIPIM 2013 (50%) | 93'178.00 | 93'178.00 | | 93'178.00 | |
| Office rent | 34'000.00 | 34'000.00 | | 34'000.00 | |
| Share of SDG fixed costs (Accounting / IT / Telephone / F&B…) | 50'000.00 | 50'000.00 | | 50'000.00 | |
| **Amount due by Element ONE as of 31.12.13** | 2'114'971.34 | 1'833'201.49 | 281'769.85 | 1'833'201.49 | 223'165.25 |
| **Equivalent USD** | 2'379'313.01 | 2'062'325.89 | 316'987.12 | 2'062'325.89 | 251'057.77 |

*Taux utilisé USD/CHF*        0.8889

Les montants pris en correction prennent en comptes les credit note reçues à date à savoir MF travel et le cash reçu pour payer la facture Michael Page.

En date du 31.03.2014, E-1 doit à au Groupe SDG l'équivalent USD de 2'379K soit 379K de plus que le loan ARGON (si on pense à une éventuelle compensation de dette)
De plus, afin de ne pas compliquer la situation de cash de SDG Capital SA, nous souhaiterions que E-1 finance par avance les frais relatifs au téléphone / Expenses / Parking / Office rent et SDG Fixed Cost pour l'année 2014 soit

**CONFIDENTIAL**

EXHIBIT 2
69

| CALCUL DES FRAIS A REFACTURER AU FOND EN 2014 (sur période 2012-2013-2014) | | |
|---|---|---|

| Amount due by Element ONE as of 31.03.14 | CHF | Avance sur 2014 |
|---|---|---|
| SDG CAPITAL | 1'707'947.05 | 20'000.00 |
| FUND (NB Management, Travels, Lawyers & Consulting) | 1'554'069.51 | |
| Interests on FUND until 31.12.2013 | 64'896.00 | |
| Interests on FUND until 31.03.2014 (provision) | 23'000.00 | |
| VAT non recoverable | 65'981.54 | |
| VAT non recoverable 2014 (provision) | - | 20'000.00 |
| SDG SA | 407'024.29 | 160'148.20 |
| Telephone NB 2012 | 17'404.00 | |
| Telephone NB 2013 | 30'629.00 | |
| Telephone NB 2014 | 6'025.67 | 10'000.00 |
| Telephone KM 2013 | 5'075.00 | |
| Telephone KM 2014 | 785.25 | 2'340.00 |
| Telephone Bilal 2013 | 1'201.00 | |
| Telephone Bilal 2014 | 743.20 | 2'250.00 |
| Salary KM | 140'326.95 | 75'778.20 |
| Expenses KM | 20'092.22 | 10'000.00 |
| Parking NB | 7'560.00 | 3'780.00 |
| MIPIM 2013 (50%) | 93'178.00 | - |
| Office rent | 34'000.00 | 18'000.00 |
| Share of SDG fixed costs (Accounting / IT / Telephone / F&B…) | 50'000.00 | 30'000.00 |
| Amount due by Element ONE as of 31.12.13 | 2'114'971.34 | 160'148.20 |
| Equivalent USD | 2'379'313.01 | 180'164.47 | 2'559'477.48 |
| Taux utilisé USD/CHF | 0.8889 | |

Ce qui représente un paiement d'environ 550'000 USD à recevoir pour SDG CAPITAL SA au plus vite.
Merci de nous confirmer ce point.

De plus, PwC souhaiterais obtenir une confirmation que les montants dus au 31.12.2013, s'ils ne sont
pas payés en 2014 par E-1 ils seront compensés par le loan ARGON reçu en Janvier 2014.
Est-ce possible de m'envoyer un mail en ce sens ?

Merci de ta réponse rapide,
Cesare

*The information contained in this communication is fully confidential and intended for the named recipient(s) only. In case you are not an intended recipient, you are hereby (a) strictly forbidden from copying, distributing this email or taking any further action relating to it, and (b) kindly requested to notify the sender and delete any copies immediately. We undertake no responsibility for the accuracy, completeness and absence of virus in this communication or any of its attachment(s). Unless otherwise stated, any views or opinions presented herein are solely those of the author. This email is intended for informational purposes only and is not a solicitation or offer to buy or sell any participation or financial instruments.*

**From:** Cesare Cerrito [mailto:cc@sdg.ch]
**Sent:** Tuesday, April 8, 2014 5:31 pm
**To:** Nicolas Bourg
**Cc:** Marc Gilliéron. Kevin Meyer; Hélène Le Marchand
**Subject:** Amount owed by One Element at 3/31/2014

Dear Nicolas,

As discussed at our last meeting, you will find enclosed the amounts owed by One Element to the SDG Group (SDG CAPITAL SA and SDG SA).

CALCULATION OF THE COSTS TO BE CHARGED BACK TO THE FUND IN 2014 (over period 2012-2013-2014)

CALCUL DES FRAIS A REFACTURER AU FOND EN 2014 (sur période 2012-2013-2014)

| Amount due by Element ONE as of 31.03.14 | CHF | Paid as of 31.03.14 | Not Paid as of 31.03.14 | Including correction Paid as of 31.03.14 | Including correction Not Paid as of 31.03.14 | * Credit note & Cash received |
|---|---|---|---|---|---|---|
| **SDG CAPITAL** | 1'707'947.05 | 1'426'177.20 | 281'769.85 | 1'426'177.20 | 223'165.25 | |
| FUND (NB Management, Travels, Lawyers & Consulting) | 1'554'069.51 | 1'272'299.66 | 281'769.85 | 1'272'299.66 | 223'165.25 | |
| Interests on FUND until 31.12.2013 | 64'896.00 | 64'896.00 | | 64'896.00 | | |
| Interests on FUND until 31.03.2014 (provision) | 23'000.00 | 23'000.00 | | 23'000.00 | | |
| VAT non recoverable | 65'981.54 | 65'981.54 | | 65'981.54 | | |
| VAT non recoverable 2014 (provision) | | | | | | |
| **SDG SA** | 407'024.29 | 407'024.29 | - | 407'024.29 | - | |
| Telephone NB 2012 | 17'404.00 | 17'404.00 | | 17'404.00 | | |
| Telephone NB 2013 | 30'629.00 | 30'629.00 | | 30'629.00 | | |
| Telephone NB 2014 | 6'029.67 | 6'029.67 | | 6'029.67 | | |
| Telephone KM 2013 | 5'075.00 | 5'075.00 | | 5'075.00 | | |
| Telephone KM 2014 | 785.25 | 785.25 | | 785.25 | | |
| Telephone Bilal 2013 | 1'201.00 | 1'201.00 | | 1'201.00 | | |
| Telephone Bilal 2014 | 743.20 | 743.20 | | 743.20 | | |
| Salary KM | 140'326.95 | 140'326.95 | | 140'326.95 | | |
| Expenses KM | 20'092.22 | 20'092.22 | | 20'092.22 | | |
| Parking NB | 7'560.00 | 7'560.00 | | 7'560.00 | | |
| MIPIM 2013 (50%) | 93'178.00 | 93'178.00 | | 93'178.00 | | |
| Office rent | 34'000.00 | 34'000.00 | | 34'000.00 | | |
| Share of SDG fixed costs (Accounting / IT / Telephone / F&B…) | 50'000.00 | 50'000.00 | | 50'000.00 | | |
| | - | - | | - | | |
| **Amount due by Element ONE as of 31.12.13** | 2'114'971.34 | 1'833'201.49 | 281'769.85 | 1'833'201.49 | 223'165.25 | |
| | | | | | | |
| **Equivalent USD** | 2'379'313.01 | 2'062'325.89 | 316'987.12 | 2'062'325.89 | 251'057.77 | |
| *Taux utilisé USD/CHF* | 0.8889 | | | | | |

**USD/CHF rate used**

The amounts to be corrected take into consideration the credit notes received to date, namely MF travel and the cash received to pay the Michael Page invoice.

As of the 3/31/2014, E-1 owes the SDG group the USD equivalent of 2,379K i.e. 379K more than the ARGON loan (if we think of a possible debt compensation)
What's more, in order not to complicate the SDG Capital SA cash position, we would like E-1 to finance in advance the costs related to Telephone / Expenses / Parking / Office rent and SDG Fixed Cost for the year 2014 i.e.

**CONFIDENTIAL**

EXHIBIT 2

71

CALCULATION OF THE COSTS TO BE BILLED BACK TO THE FUND IN 2014 (over period 2012-2013-2014)

Advance for 2014

CALCUL DES FRAIS A REFACTURER AU FOND EN 2014 (sur période 2012-2013-2014)

| Amount due by Element ONE as of 31.03.14 | CHF | Avance sur 2014 |
|---|---|---|
| SDG CAPITAL | 1'707'947.05 | 20'000.00 |
| FUND (NB Management, Travels, Lawyers & Consulting) | 1'554'069.51 | |
| Interests on FUND until 31.12.2013 | 64'896.00 | |
| Interests on FUND until 31.03.2014 (provision) | 23'000.00 | |
| VAT non recoverable | 65'981.54 | |
| VAT non recoverable 2014 (provision) | - | 20'000.00 |
| SDG SA | 407'024.29 | 160'148.20 |
| Telephone NB 2012 | 17'404.00 | |
| Telephone NB 2013 | 30'629.00 | |
| Telephone NB 2014 | 6'025.67 | 18'000.00 |
| Telephone KM 2013 | 5'075.00 | |
| Telephone KM 2014 | 785.25 | 2'340.00 |
| Telephone Bilal 2013 | 1'201.00 | |
| Telephone Bilal 2014 | 743.20 | 2'250.00 |
| Salary KM | 140'326.95 | 75'778.20 |
| Expenses KM | 20'092.22 | 10'000.00 |
| Parking NB | 7'560.00 | 3'780.00 |
| MIPIM 2013 (50%) | 93'178.00 | - |
| Office rent | 34'000.00 | 18'000.00 |
| Share of SDG fixed costs (Accounting / IT / Telephone / F&B...) | 50'000.00 | 30'000.00 |
| Amount due by Element ONE as of 31.12.13 | 2'114'971.34 | 160'148.20 |
| Equivalent USD | 2'379'313.01 | 180'164.47 | 2'559'477.48 |
| Taux utilisé USD/CHF | 0.8889 | |

*USD/CHF Rate used*

Which represents a payment of approximately USD 550,000 to be received by SDG CAPITAL SA as soon as possible. Please confirm this point.

In addition, PwC would like to get a confirmation that the amounts due at 12/31/2013, if they are not paid in 2014 by E-1, will be offset by the ARGON loan received in January 2014.
Is possible to send me a mail in this regard?

Thank you for your quick response,
Cesare

*The information contained in this communication is fully confidential and intended for the named recipient(s) only. In case you are not an intended recipient, you are hereby (a) strictly forbidden from copying, distributing this email or taking any further action relating to it, and (b) kindly requested to notify the sender and delete any copies immediately. We undertake no responsibility for the accuracy, completeness and absence of virus in this communication or any of its attachment(s). Unless otherwise stated, any views or opinions presented herein are solely those of the author. This email is intended for informational purposes only and is not a solicitation or offer to buy or sell any participation or financial instruments.*

CONFIDENTIAL

EXHIBIT 2
72



TRANSLATION CERTIFICATION

450 7th Avenue
10th Floor
New York, NY  10123
Tel 212.643.8800
Fax 212.643.0005
www.morningtrans.com

**County of New York**
**State of New York**

Date: May 11, 2016

To whom it may concern:

This is to certify that the attached translation from French into English is an accurate representation of the documents received by this office.

The documents are designated as:
- CC email to NB 08.04.2014

Austin Lowe, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

_____
Signature of Austin Lowe

Accurate Translation Services 24/7

EXHIBIT 2
73