USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6-21-2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CITY OF ALMATY, KAZAHKSTAN, and
BTA BANK JSC,

                           Plaintiffs,

      -against-

MUKHTAR ABLYAZOV, ILYAS KHRAPUNOV,
VIKTOR KHRAPUNOV and TRIADOU SPV S.A.,

                           Defendants.
------------------------------------------------------------X
------------------------------------------------------------X
CITY OF ALMATY, et ano.

                           Plaintiffs,

      -against-

Gennady Petelin

                           Defendant.
------------------------------------------------------------X

**ORDER CONCERNING NON-PARTY SUBPOENA**

15-CV-05345 (AJN) (KHP)

18 Misc. 227 (AJN) (KHP)

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

       Plaintiffs the City of Almaty, Kazakhstan and BTA Bank JSC (the "Kazakh Entities") served a document subpoena, dated December 21, 2017, on non-party Gennady Petelin (the "Subpoena"). Petelin has objected to the scope of the Subpoena, leading Plaintiffs to file the instant motion to compel (the "Motion to Compel"). As discussed below, Plaintiffs' Motion to Compel is **GRANTED IN PART**. Petelin shall be required to provide documents, to the extent they are in his possession, custody and control, as set forth below.

1

**Factual Background**

The Kazakh Entities contend that Defendants Viktor Khrapunov and Mukhtar Ablyazov, the former mayor of Almaty and former Chairman of BTA Bank, respectively, embezzled billions of dollars from them between 1997 and 2009. The Kazakh Entities have engaged in a worldwide hunt for the money and obtained a judgment in the United Kingdom ("UK") against Ablyazov, as well as an order freezing his assets (the "UK freezing order") and those of a number of companies associated with him. This action is one of many in which Plaintiffs seek to enforce its judgment against Ablyazov.

Plaintiffs contend that Ablyazov and Viktor Khrapunov co-mingled the stolen money and, with the help of Khrapunov's son Ilyas Khrapunov, laundered it through various shell companies that are the subject of the UK freezing order. They contend that approximately $70,000,000 of the stolen funds ultimately found their way through these shell entities to Triadou SPV S.A. ("Triadou"), which used the money for real estate investments in the United States, including the Flatotel and Cabrini Medical Center projects in New York City, an investment in Ohio and an investment in Syracuse. The New York City investments represent approximately $41 million of the $70 million.[1]

Triadou is a Luxembourg entity and wholly-owned subsidiary of SDG Capital S.A. ("SDG"), a Swiss entity. SDG was originally formed and owned by Defendant Ilyas Khrapunov but sold to Phillipe Glatz, a Swiss national, in or about 2015.

---

[1] Triadou subsequently exited all of its U.S. investments except its interest through a subsidiary in the Syracuse property. Its interest in the Ohio real estate project was sold at auction. It assigned its interests in the Flatotel and Cabrini Medical Center to Joseph Chetrit and his companies.

Triadou denies that it was used to launder stolen funds.  It contends that the funding for its U.S. real estate investments came in the form of a $70,000,000 loan from a company called Telford International Limited ("Telford"), which is wholly-owned by a trust belonging to Elena Petelin, Gennedy Petelin's wife.  As evidence that the money came from Telford, Triadou relies on a letter from Gennedy Petelin to Ilyas Khrapunov in which Petelin indicates he wishes to provide funding for the investments ("Petelin Letter") and loan agreements between Telford and Triadou reflecting the loan from Telford to Triadou.  Because Petelin is not accused of stealing any money from Plaintiffs and was the source of the funds for Triadou's investment, Triadou argues Plaintiffs have no right to recover monies and assets from it or purchasers/assignees.  Triadou is confident that Petelin had the funds to loan to Triadou, describing him as a Russian oligarch who was the head of the secretariat to Viktor Chernomyrdin, Russia's Prime Minister from 1992-1998, and acquired his wealth by selling his interest in Gazprom, a Russian oil and gas company now controlled by the Russian government.

Plaintiffs question Petelin's financial ability to provide funds to Triadou and believe that Ablyazov actually fronted the money to Telford that ultimately was loaned to Triadou.  They doubt the authenticity of the Petelin Letter and suspect Telford's and Petelin's involvement in the loan to Triadou is a sham because, among other reasons, Viktor Khrapunov's daughter is married to Petelin's son, Ilyas Khrapunov is married to Ablyazov's daughter, and Petelin's counsel has had communications with Ilyas Khrapunov about the Subpoena.  ███████

███████████████████████████████████████

███████████████████████████████████████

3

███████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████        ████████████████████

████████████████████████████████

████████████████████████████████████████

**Procedural Background**

Plaintiffs learned that Petelin had accounts with Wells Fargo Bank in New York and issued a subpoena to determine whether the accounts were linked to companies owned and controlled by Ablyazov. This Court narrowed the scope of that subpoena to protect Petelin's privacy and limit discoverable information to information related to transactions between Petelin's accounts and companies named by Plaintiffs known to be linked to Ablyazov by virtue of their being listed in the freezing order issued by the UK Court and/or due to information uncovered by Plaintiffs through discovery in this action. (Doc. No. 325.)[2]

Sometime after serving the subpoena on Wells Fargo, Plaintiffs learned that Petelin resides in California and served the Subpoena at issue. According to Plaintiffs, the Subpoena broadly seeks information about Petelin's finances, sources of wealth, and ability to provide $70 million to Triadou. The document itself calls for the production of:

1) All documents concerning eleven individuals including two of the individual defendants, four current or former officers or agents of Triadou, a former business partner of Triadou, an agent of Petelin who attended meetings regarding Triadou investments, two individuals who oversaw the accounts at ████████ which funded the Triadou

---

[2] All references to ECF filings are references to documents filed in 15-CV-5345.

4

investments, and an individual who witnessed Petelin signing documents related to Triadou's investments.

2) All documents concerning twenty-three named companies, including Triadou, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3) All documents concerning sale of any oil-and-gas assets owned or controlled by Petelin including Gazprom and the disposition of the proceeds of any such sale or sales.

There is a dispute about when the Subpoena was served. Plaintiffs contend it was served on December 21, 2017 through Petelin's former counsel, who also represented the Khrapunovs at that time. Petelin states the Subpoena was served on December 27, 2017, pointing to an email that Plaintiffs' counsel sent on that date asking whether Petelin's former counsel would accept service of the Subpoena. As it turns out, Petelin was in the process of changing his counsel when Plaintiffs served the Subpoena and during the 14-day window to respond set forth in Federal Rule of Civil Procedure 45 ("Rule 45"). On January 19, 2018, Petelin, through his new (and current) counsel, objected to the Subpoena as overly broad and also asserted privacy concerns. He stated he is held in disfavor by the current Russian regime controlled by Vladimir Putin and concerned that information learned in discovery may find its way to the governments of Kazakhstan and Russia and potentially lead to retaliation against him. He also expressed concern about the ability of this Court to enforce its Protective Order (Doc. No. 253) against a foreign governmental entity (e.g., the City of Almaty). The parties were unable to resolve their differences over the Subpoena, leading Plaintiffs to file the Motion to Compel compliance with the Subpoena.

In contravention of Rule 45, Plaintiffs initially filed their Motion to Compel in this Court even though the place of compliance is the Central District of California. *See* Fed. R. Civ. P.

45(d)(2)(B)(i) ("the serving party may move the court for the district where compliance is required for an order compelling production or inspection"). Accordingly, this Court dismissed the Motion to Compel. (Doc. No. 560.) Plaintiffs then initiated an action in the Central District of California to compel compliance with the Subpoena. On May 10, 2018, the Court in California transferred the Motion to Compel to this Court pursuant to Rule 45(f). (Doc. No. 655.) So, the Motion to Compel is now properly before this Court for resolution.

Plaintiffs contend that Petelin's objections were late and therefore waived. They also take issue with the generality of Petelin's objections because he did not state with specificity the basis for his objections or state whether he was withholding any responsive materials as required by Federal Rule of Civil Procedure 34(b)(2) ("Rule 34"). They also argue that the Protective Order adequately addresses his privacy concerns and that Petelin's purported fear of retaliation is unfounded because there is no evidence that production of his account information from the Wells Fargo subpoena led to any retaliation.

In response, Petelin asks that this Court excuse his late objections because the Subpoena is overbroad on its face and in light of the fact that he was in the midst of changing counsel and new counsel was promptly in touch with Plaintiffs' counsel about the Subpoena. He argues that Plaintiffs have not shown the relevance of all of the information sought by the broad requests, and that the breadth of the requests also render them unduly burdensome. He asks that the documents and information allowed to be sought from him be limited to: (1) the source of the $70 million loan from Telford out of the proceeds of which Triadou invested $41

6

million; and (2) whether Telford had access to the $70 million from sources other than the Kazakh Entities.

## Legal Standard

Rule 45 permits a party to command a non-party to produce documents and provide deposition testimony. Fed. R. Civ. P. 45(a). The issuing party "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). The party served with the subpoena may object to the subpoena but must do so before the earlier of the time specified for compliance or 14 days after the subpoena is served. Fed. R. Civ. P. 45(d)(2)(B). The court "*must* quash or modify a subpoena that . . . fails to allow a reasonable time to comply . . . requires disclosure of privileged or other protected matter, if no exception or waiver applies . . . or subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3) (emphasis added). "Motions to compel and motions to quash a subpoena are both 'entrusted to the sound discretion of the district court.'" *In re Fitch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003) (quoting *United States v. Sanders*, 211 F.3d 711, 720 (2d Cir. 2000)); *Citizens Union of City of New York v. Attorney General of New York*, 269 F. Supp. 3d 124, 138 (S.D.N.Y. 2017).

## Discussion

1. *Timeliness of Objections and Waiver*

There is no doubt that Petelin's written objections to the subpoena were at least one week late. "The failure to serve written objections to a subpoena within the time specified by Rule 45(c)(2)(B) typically constitutes a waiver of such objections." *Concord Boat Corp. v.*

*Brunswick Corp.*, 169 F.R.D. 44, 48 (S.D.N.Y. 1996) (citing *United States v. Int'l Bus. Mach. Corp.*, 70 F.R.D. 700, 701–02 (S.D.N.Y. 1976)).

But, a court may excuse late objections "in unusual circumstances and for good cause." *Motorola Credit Corp. v. Uzan*, 293 F.R.D. 595, 601 (S.D.N.Y. 2013) (quoting *Concord Boat Corp.*, 169 F.R.D. at 48) (alterations omitted), *rev'd on other grounds on reconsideration*, 73 F.Supp.3d 397 (S.D.N.Y. 2014), *on reconsideration*, 132 F.Supp.3d 518 (S.D.N.Y. 2015). Courts consider the following factors when determining whether to excuse late objections: (1) whether the subpoena is overbroad on its face and exceeds the bounds of fair discovery, (2) whether the subpoenaed witness is a non-party acting in good faith, and (3) whether counsel for the witness and counsel for the subpoenaing party were in contact concerning the witness's compliance prior to the time the witness challenged legal basis for the subpoena. *Concord Boat Corp.*, 169 F.R.D. at 48; *Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 12-cv-5067 (JFK) (JLC), No. 12-cv-7319 (JFK) (JLC), 2017 WL 4676806, at *17 (S.D.N.Y. Oct. 17, 2017); *In re Rule 45 Subpoena Issued to Cablevision Sys. Corp. Regarding IP Address 69.120.35.31*, No. 08-cv-347 (ARR) (MDG), 2010 WL 2219343, at *6 (E.D.N.Y. Feb. 5, 2010), *report and recommendation adopted in part*, 2010 WL 1686811 (E.D.N.Y. Apr. 26, 2010).

Turning to the first factor, the Court notes that Federal Rule of Civil Procedure 26(b)(1), as amended in 2015, cabins the scope of information that can be sought in discovery from parties and non-parties and restricts discovery to non-privileged matters relevant to the claims and defenses and proportional to the needs of the case. Fed .R. Civ. P. 26(b)(1). Subpoena requests must conform with this rule.

In this case, the Subpoena for documents is overbroad on its face insofar as it requests "all" documents concerning eleven different individuals, twenty-three different entities, and the sale of any oil-and-gas assets owned or controlled by Petelin and the disposition of the proceeds of such sale or sales without otherwise specifying the precise subject matter of the information sought.  "All" documents could include any number of topics wholly irrelevant to Petelin's sources of wealth and ability to provide a $70 million loan to Triadou and documentation of said loan.  It is easy to provide greater particularity in a document request to ensure that its relevance and proportionality to a matter is clear.[3]  Plaintiffs' Subpoena does not provide that clarity and therefore is overbroad.  This factor therefore weighs in favor of excusing the late filed objections.

---

[3] Rule 34 places additional burdens on a party requesting documents from another party — it requires that any document request describe with reasonable particularity each item or category of documents requested.  Fed. R. Civ. P. 34(b)(1)(A).  A failure to do so may render the request overbroad, vague or otherwise objectionable.  Rule 34(c), however, states that a non-party may be compelled to produce documents as provided in Rule 45.  Rule 45 does not contain the same language as Rule 34(b) in terms of the specificity required in document subpoenas.  It states simply that the party issuing the subpoena "must take reasonable steps to avoid imposing undue burden or expense" on the non-party.  Fed. R. Civ. P. 45(d)(1).  Other parts of Rule 45 provide protections for privileged and confidential information of a non-party.  Fed. R. Civ. P. 45(d)(3)(A)(iii); 45(e)(2).  The Court is unaware of any court in the Second Circuit to have addressed the specificity needed in a Rule 45 document subpoena to comply with the 2015 amendments to Rule 26(b)(1).  However, given Rule 45's mandate to the requesting party to avoid imposing an undue burden or expense on a person subject to the subpoena, this Court finds that a reasonable particularity requirement similar to the one contained in Rule 34(b) should be applied to document requests in a subpoena to a non-party to ensure that it conforms to the strictures of Rule 26(b)(1).  *See American Federation of Musicians of the US and Canada v. Skodam Films, LLC,* 313 F.R.D. 39, 46 (N.D. Tex. 2015) ("Although Rule 34 governs document discovery from a party and not a non-party . . . this reasonable particularity requirement should apply with no less force to a subpoena's document requests to a non-party"); *Kinetic Concepts, Inc. v. ConvaTec Inc.*, 268 F.R.D. 226, 340 (M.D.N.C. 2010); *see also High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,* 161 F.R.D. 86, 88 (N.D. Cal. 1995) ("[T]he Ninth Circuit has long held that nonparties subject to discovery requests deserve extra protection from the courts") (citing *United States v. C.B.S.*, 666 F.2d 364, 371-72 (9th Cir. 1982)).

The second factor is a closer question. Plaintiffs claim that Petelin is not a true third party and is acting in bad faith. They have produced emails between Petelin's counsel and Ilyas Khrapunov concerning Petelin's objections to the Subpoena. Petelin's attorney states that Petelin speaks Russian and very little English and wished for Khrapunov, to whom he is related, to serve as a translator, particularly given the complexity of this case, the "aggressive arguments" made by Plaintiffs about what is relevant, and his "concerns about Russia and the Putin regime using Kazakhstan as a stalking horse for their own purposes ([Petelin] was once very high up in the Russian government)." Plaintiffs accuse Ilyas Khrapunov of acting as a "gatekeeper of Petelin's actions in this litigation," arranging for him to be represented by a lawyer and directing him to file frivolous delaying objections in an effort to obstruct discovery from Petelin who Plaintiffs believe will disprove his [Ilyas's] "lies."

The fact remains, however, that Petelin is not a named party. And, while it appears that Petelin has been in contact with Ilyas Khrapunov, there is no Court order precluding communications except as to documents and information encompassed by the Protective Order. This Court previously sanctioned Ilyas Khrapunov for a violation of the Protective Order, but here, there is no basis to find that Khrapunov violated the Protective Order in his communications with Petelin. Nor do the emails make clear whether Ilyas is speaking for Petelin (i.e., as a translator) or himself. It is troubling that Petelin's counsel would elect to use Khrapunov as a translator rather than a certified legal translator to avoid the appearance of impropriety and accusations by Plaintiffs of bad faith. But the Court has insufficient information to find that Petelin is a puppet of Khrapunov as Plaintiffs suggest. This Court finds

10

that the question of good faith here turns on the nature of Petelin's objections.  Petelin's counsel asserted reasonable objections in light of the breadth of the document requests in the Subpoena.  None of the objections or Petelin's correspondence with Plaintiffs' counsel about them suggest bad faith or an intent to delay.  If anything, Plaintiffs' counsel brought on the objections and delay themselves by failing to provide greater specificity in their document requests and filing their original motion to compel in the wrong court.  On balance, this factor is neutral in terms of determining whether there was a waiver of objections.

Finally, there is no doubt that the parties were in touch concerning the Subpoena prior to the objections being due and that upon retaining new counsel, Petelin promptly provided his objections.  Though Plaintiffs argue that Petelin's change of counsel was a delay tactic, this Court is unconvinced.  Petelin's change to new counsel took less than two weeks and Petelin's new counsel took no more than a week after being retained to provide objections.  Thus, the last factor weighs against a finding of waiver.

On balance, this Court finds that Petelin did not waive his objections because there were unusual circumstances — Petelin's change in counsel, inability to speak English and family relationship with Khrapunov, as well as the overbreadth of the requests themselves and private nature of the information sought.

### 2. *Scope of Subpoena*

The party seeking discovery bears the initial burden of proving the discovery sought is both relevant to any party's claim or defense and proportional to the needs of the case.  *See* Rule 26(b)(1); *Allison v. Clos-ette Too, L.L.C.*, No. 14-cv-1618 (LAK) (JCF), 2015 WL 136102, at *8

(S.D.N.Y. Jan. 9, 2015); *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 284 F.R.D. 132, 135 (S.D.N.Y. 2012). A relevance analysis necessarily merges with an overbreadth analysis insofar as a request is insufficiently tailored to the claims and defenses in the matter.

Plaintiffs contend the information sought in the Subpoena is relevant to Defendants' defenses in this action because those that have testified thus far have stated that Petelin directed or approved all of Triadou's investments and that only Petelin has documentary proof of his conduct vis-à-vis Triadou. This Court previously recognized the relevance of Petelin's finances to the defenses in this action. (Doc. Nos. 325, 560.) However, the Court did not sanction a free-range inquiry into all of Petelin's finances. Rather, in connection with authorizing disclosure of certain bank records, the Court limited disclosure to transactions with entities associated with Ablyazov or listed in the UK freezing order.

Plaintiffs have explained the relevance of the persons listed in Request Number 1 of the Subpoena. All of the individuals are either Defendants in this case or former or current employees or agents of Petelin, Triadou or ▮▮▮▮▮▮▮ (which facilitated the transfer of money from Telford to Triadou). Plaintiffs also have explained the relevance of many of the entities listed in Request Number 2 of the Subpoena. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Finally, Plaintiffs explain the information requested in Request No. 3 is to confirm that the source of Petelin's wealth is from legitimate sources predating the embezzlement of funds from Plaintiffs by Ablyazov and Viktor Khrapunov.

Petelin does not dispute the relevance of the individuals listed in Request Number 1. Finally, Petelin questions the relevance of Request Number 3 insofar as it seeks detailed information about his financial transactions going back to the early 1990s rather than information about his wealth in or around the time he and/or Telford made the loan to Triadou. He also takes issue with the requests for "all" documents rather than specific categories of documents tethered to the claims remaining in this action.

This Court agrees with Petelin that Plaintiffs have not explained why they require "all" documents concerning the persons and entities listed in Requests Numbers 1 and 2 or why they require "all" documents concerning Petelin's sale of his oil and gas interests and disposition of same. Thus, Plaintiffs have failed to justify the breadth of their requests on relevance grounds. The Court also notes that Plaintiffs utterly failed to address how their requests for "all" documents are proportional to the needs of this case as required under Rule 26(b)(1). The

13

Court also agrees with Petelin as to the entities that should be stricken from Request Number 2.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████ Nor have they adequately explained how oil and gas entities other than Gazprom are relevant. Thus, the requests are improper insofar as they seek information that is neither relevant nor proportional to the needs of the case.

To the extent Petelin objects to the time period applicable to the document requests, those objections are overruled. It is reasonable for Plaintiffs to seek information from 2010, shortly after their funds were stolen through the date of the loan to Triadou and during the course of this litigation. This will permit Plaintiffs to obtain discovery into the period when the stolen funds were allegedly being laundered through various entities.

To the extent Petelin expresses concerns about production of private financial information, particularly with respect to Request Number 3, the Court recognizes that "individuals have certain constitutionally protected privacy rights, including 'the individual interest in avoiding disclosure of personal matters.'" *Arias-Zeballos v. Tan,* No. 06-cv-1268 (GEL) (KN), 2007 WL 210112, at *1 (S.D.N.Y. Jan. 25, 2007) (citing *In re McVane,* 44 F.3d 1127, 1136 (2d Cir. 1995)). When a subpoena seeks the production of an individual's personal financial information, the court must "balance the relevance of the information sought against the intrusion into the affected individual's privacy interests." *Glitnir banki hf,* No. 08-cv-14757 (SMB), 2011 WL 3652764, at *5 (S.D.N.Y. Aug. 19, 2011); *see also Solow v. Conseco, Inc.,* No. 06-

cv-5988 (BSJ) (THK), 2008 WL 190340, at *4 *(S.D.N.Y. Jan. 18, 2008) (court must weigh relevance against privacy interests).  The breadth of Request Number 3 in consideration of Petelin's privacy rights warrants a finding that the Subpoena is overbroad and unduly burdensome.  This too requires the Court to modify the documents requests in the Subpoena.

The Court does not share Petelin's concerns about his ability to enforce the Protective Order in this case given that there has been no allegation of retaliation against him in connection with the production of information about his finances from Wells Fargo.  Any confidential information produced by Petelin may be marked as such and afforded the protections of the Protective Order.  Additionally, Petelin's counsel may mark information Attorneys' Eyes' Only to the extent appropriate in accordance with the terms of the Protective Order.

### 3. Limitations on Subpoena

For the reasons set forth above, the Court modifies the Subpoena as follows.  With respect to Request Number 1, Petelin shall produce:

- Written communications (e.g., emails, text messages, transcribed voicemails, letters and handwritten notes) between, on the one hand, Petelin, any agent of Petelin or any Telford entity and, on the other hand, any of the individuals identified in the request that (1) concern receiving, transferring, or loaning money (directly or indirectly) to SDG or Triadou for the period January 2010 to the present or (2) this lawsuit;
- Written communications (e.g., emails, text messages, transcribed voicemails, letters and handwritten notes) in Petelin's or any Telford entity's possession, custody or control mentioning (1) any of the individuals identified in the request and that concerns receiving, transferring, or loaning money (directly or indirectly) to SDG or Triadou for the period January 2010 to the present or (2) this lawsuit;
- Documents reflecting the source of the $70 million loan from any Telford entity (e.g., bank records, wire transfer records, loan documents);

- Documents reflecting repayment or requests for repayment of the $70 million loan from Petelin or any Telford entity to SDG and/or Triadou (e.g., bank records, invoices, transfer letters, receipts);
- Documents sufficient to show Petelin's net worth and amount of liquid assets he had in the year prior to and immediately following the $70 million loan to SDG or Triadou;
- Documents sufficient to show the assets and financial capability of any Telford entity to loan $70 million in the year prior to and immediately following the $70 million loan to SDG or Triadou; and
- Documents reflecting Petelin's or any Telford entity's receipt of funds, and the amount of such funds, from any of the following entities listed in Request No. 2 from January 1, 2010 to and immediately following the $70 million loan to SDG or Triadou: ███████ ███████████████████████████████

With respect to Request Number 2, Petelin shall produce:

- Written communications (e.g., emails, text messages, transcribed voicemails, letters and handwritten notes) between, on the one hand, Petelin, any agent of Petelin or any Telford entity and, on the other hand, any employees or representatives of the following entities identified in Request Number 2 that concern (1) receiving, transferring or loaning money (directly or indirectly) to SDG or Triadou for the period January 2010 to the present or (2) this lawsuit: ███████████████████████ ███████████████████████████
- Written communications (e.g., emails, text messages, transcribed voicemails, letters and handwritten notes) in Petelin's or any Telford entity's possession, custody or control mentioning (1) any of the companies identified in the immediately preceding bullet point and that concern receiving, transferring or loaning money (either directly or indirectly) to any Telford entity, SDG or Triadou for the period January 2010 to the present or (2) this lawsuit; and
- Documents sufficient to reflect any receipt, transfer or loan of money, and the amount, between and among or to any of the companies identified in the immediately preceding bullet points for the period January 2010 to the present.

With respect to Request Number 3, Petelin has represented that he does not have any documents related to his sale of any interest in Gazprom. Notwithstanding the passage of time, this contention seems incredible. Petelin is directed to carefully review with his attorney whether there are any documents sufficient to show the source of his wealth. Additionally,

16

Petelin shall produce documents sufficient to show the amount of liquid assets he or any Telford entity had in the year prior to and immediately following the $70 million loan and/or the source of the $70 million loan.

### 4. Petelin's Deposition

Plaintiffs have noticed Petelin's deposition. The scope of questions during the deposition shall be limited consistent with the above, except that Plaintiffs may ask questions about Petelin's search for documents and, in light of the lack of documentation, general questions about his interests in Gazprom and the sale of same.

### Conclusion

Petelin shall produce the documents set forth above within three weeks of the date of this Order.

**SO ORDERED.**

Dated: June 21, 2018
    New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge

17